275 S.E.2d 608 (1981)
Boyd Douglas SULT, Jr.
v.
COMMONWEALTH of Virginia.
Record No. 800512.
Supreme Court of Virginia.
March 6, 1981.
Stuart B. Campbell, Jr., Wytheville (Campbell, Young & Hodges, Wytheville, on briefs), for appellant.
Jerry P. Slonaker, Asst. Atty. Gen. (Marshall Coleman, Atty. Gen., on brief), for appellee.
Before CARRICO, C. J., and HARRISON, COCHRAN, POFF, COMPTON and THOMPSON, JJ.[1]
COCHRAN, Justice.
The indictment on which Boyd Douglas Sult, Jr., was tried charged that on or about March 15, 1977, he and Virginia Sult[2] obtained money by false pretenses with intent *609 to defraud[3] by selling to Susie Johnson Manuel for $4,300 a stolen 1976 automobile that they represented to her to be a 1975 model. At the commencement of Sult's jury trial, the Commonwealth announced that it was proceeding on the theory that the accused was an aider and abettor to Virginia Sult. Instructions based upon that theory were given to the jury, which found Sult guilty as charged and fixed his punishment at confinement in the State penitentiary for 15 years.
By order entered October 16, 1979, Sult's motion to set aside the verdict was granted by the trial court on the ground that there was insufficient evidence that Virginia Sult had committed the alleged crime as a principal in the first degree, so that Sult could not be convicted of the offense, as a principal in the second degree, for aiding and abetting her. In the order, the court set the case for retrial on a specified date "should the Commonwealth be so advised". By order entered October 25, 1979, however, the court granted the Commonwealth's motion to vacate the order of October 16 and reinstated the jury verdict. On January 23, 1980, final judgment was entered on the verdict. The dispositive question presented to us in Sult's appeal is whether the evidence is sufficient to support the verdict.
The uncontradicted evidence of the Commonwealth showed that Susie Johnson Manuel purchased from Sult's Used Cars in March, 1977, a red Chevrolet Camaro which was represented to her to be a 1975 model. In fact, the automobile was a 1976 model that had been stolen from its owner, Patricia Burks, in Buffalo, New York, in September, 1976.[4] The plate containing its vehicle identification number (VIN) had been replaced with the VIN plate of a burnt orange 1975 Camaro that had been wrecked by its owner, Albert Conley, in Bland County in October, 1976, sold for salvage to a repair shop, and resold to Sult's Used Cars. Subsequently, the wrecked 1975 car from which the VIN plate had been removed was found in a field about a mile from the location of Sult's Used Cars.
In view of the theory upon which the Commonwealth elected to try Sult, it is necessary to determine whether the evidence is sufficient to show that Virginia Sult knew that Sult's Used Cars did not have a valid title to the car that was sold to Mrs. Manuel. Such guilty knowledge must be shown before Mrs. Sult could be held to have (1) intended to commit a fraud, (2) used false pretenses for that purpose, and (3) actually defrauded Mrs. Manuel, all of which are prerequisites to her conviction of the offense of obtaining money under false pretenses. See Riegert v. Commonwealth, 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977); Bourgeois v. Commonwealth, 217 Va. 268, 272, 227 S.E.2d 714, 717 (1976). Our law is clear that no one can be convicted as a principal in the second degree or as an accessory unless the evidence establishes the commission of the offense by a principal in the first degree. Dusenbery v. Commonwealth, 220 Va. 770, 771-72, 263 S.E.2d 392, 393 (1980); Anderson v. Commonwealth, 215 Va. 21, 24-25, 205 S.E.2d 393, 395 (1974); Snyder v. Commonwealth, 202 Va. 1009, 1014-15, 121 S.E.2d 452, 456-57 (1961).
Mrs. Manuel testified that in March, 1977, she drove past the red Camaro at Sult's Used Cars each day for about a week before she stopped and negotiated for its purchase. She dealt only with Mrs. Sult, whose first name she did not know; Mrs. Sult informed her that the car was a 1975 Camaro. According to Mrs. Manuel, Mrs. Sult said "they bought some of their cars from Tennessee at auction, but [she] just *610 told me that one came from the auction". Mrs. Sult also told Mrs. Manuel that, while she was trying out the Camaro, Sult, who was observed on a tractor on the lot, would look at her old car and determine what trade-in allowance he would give.
Mrs. Manuel drove the Camaro, found that it "was like new", and agreed to buy it for $4,475, less $775, the amount that Mrs. Sult reported Sult would allow for her car. These figures were included in a bill of sale of Sult's Used Cars dated March 16, 1977, signed by Mrs. Manuel as Sandra Susan Johnson, her name before her subsequent marriage, and by "V. Sult", who signed in the space designated for "salesman". The bill of sale, introduced in evidence, contained in addition to various inconsequential errors a description of the Camaro as a 1975 model, and the VIN (designated "serial number" on the document) for the 1975 Camaro wrecked by Conley.
Without objection, photostatic copies of the Division of Motor Vehicles records pertaining to the title to the 1975 Camaro were introduced into evidence. On the back of the last title certificate three forms were filled in to complete the purchase by Mrs. Manuel. In the Assignment of Title by Registered Owner and in the Re-Assignment of Title by Registered Dealer were what purported to be the signatures of Sult's Used Cars by Boyd D. Sult, Jr. Sandra Susan Johnson, shown as the purchaser, signed the third form, the Purchaser's Application for New Certificate of Title. The date of sale shown on all three forms was March 16, 1977. Included in the records was an earlier title to the 1975 Camaro showing that on December 15, 1976, Albert M. Conley and Mary Edna Conley had assigned the title to Sult's Used Cars and that Boyd D. Sult, Jr. had signed for Sult's Used Cars the Purchaser's Application for New Certificate of Title.
Albert Conley testified that he had bought the 1975 Camaro about a month before he wrecked it; he never obtained title to the car. His mother, Mary Edna Conley, was cosigner with him for the car loan on which he was making payments. After the wreck, his insurance carrier settled with him. He later "got a message from Mrs. Sult's" that "they" had bought the car and that he must "sign the title" so that his insurance company would pay him off.
R. Vaughn Cassell, insurance adjuster for Conley's insurance carrier, testified that the 1975 Camaro was totally wrecked on October 28, 1976. He settled with Conley in two payments. There was some delay, but after Conley delivered the application for a title and the certificate of title from the original owner, Cassell made the second payment for the balance due of $500. On November 22, 1976, Cassell sold the wrecked car for $260 plus the wrecker charge to Walter Cline, who operated an automobile body repair shop.
Cline testified that he bought the wrecked car from Cassell and had it moved to his place of business. Sult came over one morning, saw the wreck, and asked Cline how much he wanted for it; Cline priced it at $500. Sult asked if he had a title and, when Cline responded affirmatively, said that he would get a trailer and return for the car. When Sult explained he needed the "suspension" from the car, Cline told him that he already had a suspension that he had removed from another automobile, but Sult did not respond and paid him $500 for the wrecked Camaro. The VIN plate was still on the car when Cline sold it to Sult. Cline was familiar with VINs and knew that by means of a VIN the original paint color, year of manufacture, and other information pertaining to the vehicle could be determined. He recalled that the original paint color of the 1975 Camaro was described "in the book" as burnt orange.
Cline testified that he could look at a VIN and recognize some of the information therein included, and that this was not unusual in the garage or repair business. He said it would be important for any repair man or garage man who was going to make an estimate on a car to know the significance of the VIN and to "look under the hood" to determine the year of manufacture, a fact which many owners do not *611 know. By checking the VIN in the parts manual furnished by the automobile manufacturer an appraiser can get all the necessary information. Cline conceded on cross-examination that it is difficult for a layman to distinguish a 1975 from a 1976 model merely by looking at it.
Charles W. Bralley, an investigator with the Virginia State Police, testified that he located the wrecked 1975 Camaro on July 26, 1978. The "portion of the dash [of the wrecked vehicle] that had previously borne the identification number had been cut out" and the VIN was missing. He took photographs of the wreck, including pictures of the derivative numbers stamped on the motor and the firewall. With Mrs. Manuel's permission, he checked the red 1976 Camaro (which he had stopped the same day) and found that the derivative number did not match the VIN shown on the dashboard. In order to replace the VIN plate in the 1976 Camaro it would have been necessary to remove either the windshield or the dashboard. After ascertaining that the Manuel car had been stolen in Buffalo, he confiscated the vehicle and interviewed Sult, who had a shop in the basement of Sult's Used Cars where he did mechanical work. Bralley did not know whether Sult had any business connection with Sult's Used Cars.
Guy Davidson, a special agent employed by the National Automobile Theft Bureau, testified to the use and meaning of identification numbers assigned to automobiles. Referring to a manual, he related the information encoded in the VIN and explained that most automobile manufacturers stamp a part but not all of the VIN in other locations, such as the motor and the firewall. The VIN and the derivative number describe the same individual vehicle. On cross-examination, Davidson conceded that it would be unusual for an ordinary citizen to see the manual which enabled him to interpret the identification numbers.
At the conclusion of the presentation of evidence by the Commonwealth, Sult moved to strike the evidence on the ground that it failed to show that Virginia Sult had committed the underlying offense charged in the indictment or that Sult, without any personal contact with Mrs. Manuel, had aided and abetted his mother. In his argument on the motion, Sult's counsel asserted that there was no evidence that Virginia Sult had knowledge that the car she sold to Mrs. Manuel was stolen. The trial court observed that, although opposing counsel had been talking about aiding and abetting throughout the trial, the indictment charged both Sults jointly with being principals. Sult's counsel responded that this was contrary to what the Commonwealth's Attorney had informed the court and counsel before trial, and that there was no evidence that Sult had anything to do with the sale to Mrs. Manuel.
The Commonwealth's Attorney argued that it was not necessary to prove that Virginia Sult knew the car was stolen, but only that she knew that Sult's Used Cars did not own the car. He then argued that there was circumstantial evidence to show that she had such knowledge and that Sult aided and abetted her by replacing the VIN on the 1976 car with that removed from the wrecked 1975 vehicle. At no time did he contend that the evidence was sufficient to show that Sult was a principal in the first degree.
The trial court denied the motion to strike, ruling that the case was one of circumstantial evidence and inferences therefrom that should be resolved by the jury. Sult presented no evidence.
Instruction No. 1, proffered by the Commonwealth, required the Commonwealth to prove that Virginia Sult knew that Sult's Used Cars did not own or have title to the car sold to Mrs. Manuel. Instruction No. 4, proffered by Sult, informed the jury that Sult was charged as a principal in the second degree, and that the Commonwealth must prove that the crime of obtaining money under false pretenses was committed by a principal in the first degree. Instruction No. 5, proffered by Sult, defined a principal in the second degree. Instruction No. 6, proffered by Sult, required the Commonwealth to prove criminal intent on the part of Virginia Sult in order to find Sult guilty.
*612 Instruction No. 9, proffered by Sult, provided as follows:
The Court instructs the jury that if Virginia Sult sold the automobile to Susie Johnson Manuel with the honest belief that she had a right so to do and without actual knowledge that the vehicle had been stolen, then you shall find the Defendant, Boyd D. Sult, Jr., not guilty.
The foregoing instructions, and several others with which we are not concerned, were granted by the trial court. Thus, the conviction of Sult was clearly made dependent upon the sufficiency of the evidence against Virginia Sult.
In oral argument before us, the Attorney General, while expressing misgivings as to the focus of the instructions when much evidence pointed directly to Sult as a principal in the first degree, contended that the evidence and reasonable inferences drawn therefrom were sufficient to support the jury verdict. He relied upon the cumulative effect of six pieces of circumstantial evidence.
First, Virginia Sult signed, as "salesman", the bill of sale for the 1975 Camaro. The Commonwealth argues that Virginia Sult was not an ordinary citizen, but one familiar with automobiles, so that it is reasonable to infer that she must have know that she was selling a car with the incorrect title. It is incredible, the Commonwealth urges, that a used car salesman would innocently sell a 1976 automobile as a 1975 model, and there must necessarily have been concerted criminal action by mother and son.
Second, the VIN plate was transferred from the 1975 Camaro to the 1976 model. The evidence shows that Sult, after ascertaining that Cline had title to the 1975 car, bought the wreck for $500 for its suspension when another suspension was more readily available.
Third, the plate bearing the VIN was on the wrecked 1975 car when Sult purchased it from Cline, but the plate was subsequently cut from the dashboard and installed in the 1976 car sold to Mrs. Manuel. The 1975 wreck, with VIN plate missing, was found about a mile from Sult's Used Cars.
Fourth, Conley testified that he received a message from "Mrs. Sult's" to sign the title in order to obtain final payment from his insurance company. Although other evidence casts doubt as to the time Conley received payment, the Division of Motor Vehicles records show that he did indeed sign the title certificate and assign it to Sult's Used Cars.
Fifth, Sult had a mechanic's shop in the basement of Sult's Used Cars, which the Commonwealth says justifies the inference of concerted action. We agree that there was evidence from which the reasonable inference could be drawn that Sult knew the meaning of the VIN and transferred the VIN from the 1975 wreck to the stolen car.
Sixth, Mrs. Sult represented to Mrs. Manuel at the time of sale that "they" bought some cars from Tennessee at auction, and that the one purchased by Mrs. Manuel "came from the auction".
The problem with this circumstantial evidence is that it fails to show that Mrs. Sult knew that the car was stolen, or had not come from the auction in Tennessee, or was bearing a VIN plate transferred from a wrecked vehicle, or that she was familiar with the significance of VINs or other derivative identification numbers. Indeed, there is no evidence as to Mrs. Sult's connection, other than as a salesperson, with Sult's Used Cars. From the evidence, as presented, Mrs. Sult could have acted as "salesman" solely at the direction of her son, who signed the title papers, and she could have been completely ignorant of the peculiar history of the vehicle which she sold. The evidence that comes nearest to showing a closer connection with the business is Conley's testimony that he received the message from "Mrs. Sult's" to sign the title. But even this falls short of establishing that Mrs. Sult made the call or was aware of any such conversation. Unless we can say that it is reasonable to infer that every used-car salesperson will personally check the VIN against the derivative identification *613 numbers before selling a used car we cannot hold the evidence in this case sufficient to prove that Mrs. Sult committed the principal offense. We hold that the evidence is insufficient as a matter of law to justify such an inference.
For the reasons assigned, the judgment will be reversed and final judgment will be entered for Sult. Hudson v. Louisiana, ___ U.S. ___, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981); Greene v. Massey, 437 U.S. 19, 25 n.7, 98 S.Ct. 2151, 2154 n.7, 57 L.Ed.2d 15 (1978); Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
Reversed and final judgment.
NOTES
[1] Mr. Chief Justice I'Anson presided at the oral argument of this case but retired January 31, 1981.
[2] Although their relationship was not established by the evidence, the Commonwealth at trial and on appeal asserted without contradiction that Virginia Sult is the mother of Boyd Douglas Sult, Jr.
[3] Code § 18.2-178, to which the indictment referred, provides:

If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; ....
[4] The car was conclusively identified by derivatives of its vehicle identification number that were permanently stamped into the engine and firewall.