### Richmond

RAYMOND LEE SUTTON

V.

COMMONWEALTH OF VIRGINIA

Record No. 831787.

VIRGINIA GRAY SUTTON

V.

COMMONWEALTH OF VIRGINIA

Record No. 831788.

January 8, 1985.

Present: All the Justices.

*Alvin B. Fox (Fox, Wittan and Reiss, P.C.,* on brief), for appellant. (Record No. 831787).

*Robert Q. Harris, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee. (Record No. 831787).

*G. Mark Ailsworth (Mulkey & Ailsworth,* on brief), for appellant. (Record No. 831788).

*Robert Q. Harris, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee. (Record No. 831788).

COCHRAN, J., delivered the opinion of the Court.

In a joint trial, the trial court, sitting without a jury, convicted Raymond Lee Sutton and Virginia Gray Sutton, his wife, of the rape of Virginia's 15-year-old niece on July 23, 1982. Virginia was convicted as a principal in the second degree. The court sentenced each to confinement in the penitentiary for 30 years. In separate appeals, consolidated for argument, each contends that the evidence is not sufficient to sustain the conviction.

The prosecutrix, Beverly ___, complained to the authorities in February of 1983. Raymond gave a signed statement admitting that he and Beverly had a sexual relationship after she came to live with him and his wife in 1982 and that he had sexual intercourse with Beverly more than once. The statement was introduced in evidence as an exhibit at trial. We will review the evidence, of course, in the light most favorable to the Commonwealth.

Beverly lived with her parents in North Carolina until they were divorced when she was seven. For the next five years she lived with her mother in Fayetteville. When she was ten, she was raped by a male friend of her mother. She began to drink alcoholic beverages and use drugs. Her mother, no longer able to control her, sent Beverly to live with her father in another location in North Carolina when she was twelve. Describing life with her father as "horrible," Beverly said that he beat her "all the time." Beverly, who has had a hearing problem throughout her life, wears a hearing aid and reads lips.

While she was growing up, Beverly often saw her mother's sister, Virginia, and Virginia's husband, Raymond. Beverly corresponded with Virginia during the period 1979-1981 when the Suttons were living in Germany. Raymond, age 44, was an Army sergeant with 12 years of service at the time of trial. The Suttons were aware of Beverly's use of alcohol and drugs; they knew that her father beat her. Beverly testified that she had not used drugs for four years before the trial, except for the use of marijuana on one occasion.

Beverly visited the Suttons for two weeks in December of 1981. During this visit, Virginia told her that before the Suttons went to Germany, Raymond had sexual intercourse with Beverly's sister who was then living with them. Virginia further stated that it would be good for Beverly to have sexual intercourse with Raymond. Virginia, believing that Beverly thought that all men would beat her because her father did so, suggested that she could overcome her fear by going to bed with Raymond. On each of the two occasions that Virginia brought up the subject, Beverly rejected the suggestion.

About two or three in the morning on Christmas Day, 1981, Raymond and Beverly returned home in his van from his landlady's residence. Parking in the driveway, Raymond began kissing and fondling Beverly and even "got [her] down" on the floor of the vehicle. Beverly begged Raymond to leave her alone, and he finally released her. Beverly said she was scared at the time and was also afraid to tell her father what had happened. The next day Raymond informed Virginia of the incident; Virginia advised Beverly that she should have submitted to Raymond, that it would have helped her.

During the December visit, the Suttons talked to Beverly about getting her away from her father because of his mistreatment of

her. In May, after her father had administered another beating, Beverly called the Suttons to report the intolerable situation. In July, after the school session was over, the Suttons brought Beverly from her father's home in North Carolina to theirs in Newport News. For a week, her older sister also stayed with the Suttons. After her sister left, Raymond tried to get Beverly to go to bed with him. When she refused, he became angry. Subsequently, Raymond and Beverly agreed that, in order to get school clothes and anything she needed, she would have sexual intercourse with him. Her choice was to agree or to return to her father, who would beat her. She did not know where her mother was at that time.

The Suttons and Beverly spent a July weekend in North Carolina. Upon their return on July 18, Raymond again attempted to have sexual intercourse with Beverly; she "begged and begged" until he abandoned the effort. Raymond again became angry. The next day, Virginia charged Beverly with thinking she was "too good to go to bed with" her uncle and warned that if she were not "any better than that," Virginia would take her back to North Carolina. Virginia said that it was Beverly's fault that Raymond was "hurting."

Beverly had observed violence in the Suttons' home. She saw Virginia and Raymond hit each other during arguments. She once saw Raymond strike his stepson in the face, causing him to bleed. Beverly believed the Suttons when they said that since they had custody of her, they could punish her for anything she did of which they disapproved.

On July 22, the Suttons took Beverly to get birth control pills for which the Suttons paid. The next night, Beverly went to bed early. Raymond came into her bedroom, waked her, began to talk, and fondled her breasts and vaginal area. She repeatedly begged him to leave her alone, but he would not do so. His voice rose as he became angry. She was frightened when he began to fondle her again. She testified, "I was so scared, I didn't push him away, and I didn't say anything except to please stop." She was afraid that either the Suttons would send her back to North Carolina or Raymond might become so angry that he would beat her. She could not fight him off, she was too scared to move. Raymond forced himself on her. She thought he was "mad" at her and was afraid that he would hit her, so they had sexual intercourse. Their earlier agreement to have sexual relations "never crossed" her mind. She

recorded in her diary that she and Raymond "made love" on July 23.

After this first incident, Raymond and Beverly had sexual intercourse a number of times. Beverly said she was afraid not to comply. Virginia expressed the desire to see her husband have intercourse with her niece; accordingly, on two occasions, all three were in the same bed when the act occurred.[1]

Several months later, Raymond asked Beverly to try to get her friend Teresa to go to bed with him. Beverly then revealed to Teresa and Beth, another friend, what had transpired between Raymond and herself. Teresa testified that Beverly was upset, that she said she had been abused but was afraid to tell anyone about it. With the encouragement of Teresa, Teresa's mother, and Beth, Beverly went to the school guidance counselor and to the police and made a full report.

Raymond, testifying in his own behalf, acknowledged that he and his wife believed Beverly when she told them that her father beat her and she was afraid of him. When Raymond first asked Beverly to have sexual relations with him in July she refused. He asked her again "to see whether she had changed her mind." Raymond, conceding that he wanted to have sex with her, said he agreed that he would make sure she would not have to return to her father if she submitted. He admitted that he first had sexual intercourse with her on July 23. Raymond denied ever threatening, assaulting, coercing, or intimidating Beverly. He admitted that he gave her the money to buy birth control pills. He also admitted that he had discussed with Virginia more than once his desire to have sex with Beverly and that on two occasions Virginia was on the bed with him when he was having sexual intercourse with Beverly.

### 1. *Raymond Lee Sutton.*

■ Prior to its amendment in 1981, Code § 18.2-61 (Repl. Vol. 1975) provided punishment for any person who shall "carnally know a female of thirteen years of age or more against her will, by force."

---

[1] Raymond and Virginia were each convicted of two offenses against a child over whom they maintained a custodial or supervisory relationship, in violation of Code § 18.2-370.1. Each was sentenced to serve five years for each offense. These convictions are not the subject of the present appeal.

Code § 18.2-61 (Repl. Vol. 1982), as amended (Acts 1981, c. 397), provides in pertinent part as follows:

> If any person has sexual intercourse with a female or causes a female to engage in sexual intercourse with any person and such act is accomplished (i) against her will, by force, threat or intimidation . . ., he or she shall, in the discretion of the court or jury, be punished with confinement in the penitentiary for life or for any term not less than five years.

In substituting the words "sexual intercourse" for "carnally know" the General Assembly made no change in meaning. *See Strawderman v. Commonwealth,* 200 Va. 855, 858, 108 S.E.2d 376, 379 (1959). But the definition of rape was significantly enlarged. Under the statute prior to amendment, it was necessary to prove sexual intercourse against the victim's will "by force." *See Snyder v. Commonwealth,* 220 Va. 792, 796, 263 S.E.2d 55, 57 (1980); *Jones v. Commonwealth,* 219 Va. 983, 986, 252 S.E.2d 370, 372 (1979). Under the amended statute it is sufficient to prove sexual intercourse against the victim's will "by force, threat or intimidation."

The trial judge, sitting as the trier of fact, based the convictions on a finding of intimidation. At the conclusion of the trial, he announced his ruling from the bench. After noting how positively Beverly had testified, both on direct examination and cross-examination, the judge made this statement:

> I disagree with defense counsel that there isn't sufficient evidence of intimidation. Certainly, the whole thing reeks with intimidation when the husband and wife in this case knew of the difficulties this child had had over the years and that she was horrified to go back with her parents.

Raymond contends that the evidence is insufficient to prove that he had sexual intercourse with Beverly on July 23 against her will by force, threat, or intimidation. While the record shows that he displayed no weapon and did not verbally threaten Beverly with bodily harm, Beverly testified that Raymond "forced himself" on her and she was too frightened to fight him off. Nevertheless, since the trial court made only a finding of intimidation, we will focus on that aspect of the case.

"Intimidation" is defined as follows in Black's Law Dictionary (5th ed. 1979) at page 737:

Unlawful coercion; extortion; duress; putting in fear.

To take, or attempt to take, "by intimidation" means willfully to take, or attempt to take, by putting in fear of bodily harm. Such fear must arise from the willful conduct of the accused, rather than from some mere temperamental timidity of the victim; however, the fear of the victim need not be so great as to result in terror, panic, or hysteria.

It is apparent that the legislative intent, in amending the statute to include a prohibition against sexual intercourse with a woman against her will by threat or intimidation, was to expand the parameters of rape. There is a difference between threat and intimidation. As used in the statute, threat means expression of an intention to do bodily harm. Intimidation may occur without threats. Intimidation, as used in the statute, means putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will. Intimidation may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure.

Submission through fear to sexual intercourse is not consent. Even under the pre-1981 definition of rape, where the intercourse was induced through fear of a person whom the victim was accustomed to obey, such as a person standing *in loco parentis,* a conviction was affirmed in *Bailey* v. *Commonwealth,* 82 Va. 107 (1886). In that case, a man came to his 14-year-old stepdaughter in her bedroom where other children were asleep. She forbade his actions but he forced himself upon her without further protest or any outcry or resistance by her. The record showed that the girl was accustomed to regard her stepfather as her protector and guardian. This Court said:

A consent induced by fear of bodily harm or personal violence is no consent; and, though a man lay no hands on a woman, yet, if by an array of physical force he so overpowers her mind that she does not resist, he is guilty of rape by having the unlawful intercourse.

*Id.* at 112.

Raymond argues that there is no evidence of intimidation because Beverly had no reasonable apprehension of danger, measured by an objective standard. He says that the law of robbery requires this interpretation of "intimidation" which by analogy should be applied in this case.

█ In Virginia, robbery is a common-law crime punishable by statute. It consists of a taking of property with intent to steal from the person or presence of another, against his will, by violence or intimidation. *Comer* v. *Commonwealth,* 211 Va. 246, 250, 176 S.E.2d 432, 435 (1970); *Mason* v. *Commonwealth,* 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958). The element of intimidation requires that the victim be "actually put in fear." *Falden* v. *Commonwealth,* 167 Va. 549, 554, 189 S.E. 329, 331 (1937). But Raymond cites no Virginia authority to support his contention that the intimidation required to sustain a robbery conviction must create a reasonable apprehension of danger.

█ There is no standard of reasonableness expressly provided by Code § 18.2-61. Moreover, the cases from other jurisdictions do not universally hold that in rape cases the fear induced by the defendant's intimidating actions must be judged by an objective standard of reasonableness. *See Salsman* v. *Com.,* 565 S.W.2d 638, 641 (Ky. Ct. App. 1978); *State* v. *Pierce,* 438 A.2d 247, 252 (Me. 1981); *Dinkins* v. *State,* 92 Nev. 74, 79, 546 P.2d 228, 230 (1976); *State* v. *Barnette,* 304 N.C. 447, 461, 284 S.E.2d 298, 306 (1981); *Dumer* v. *State,* 64 Wis.2d 590, 609, 219 N.W.2d 592, 603 (1974).

In *People* v. *St. Andrew,* 101 Cal. App.3d 450, 466, 161 Cal. Rptr. 634, 644 (1980) (conviction reversed on other grounds), the court held that a mental hospital attendant can be convicted of rape of a patient even if the victim's fear is not reasonable when tested by normal standards. In *People* v. *Reyes,* 153 Cal. App.3d 803, 807, 200 Cal. Rptr. 651, 655 (1984) (involving sexual offenses by a stepfather against his stepdaughters, ages 9 and 12), the subjective fear principle of *St. Andrew* was extended to parent-child and adult-child relationships.

Raymond concedes on brief that the Commonwealth proved that Beverly "was in fear when she consented to the initial act of intercourse," but he says that her fear arose from her "temperamental timidity" rather than from any act of his which reasonably could be expected to cause fear. We disagree.

Beverly testified to her actual fear when she was awakened by Raymond on July 23. She feared both physical harm from him and the inevitability of further physical abuse from her father if she did not submit. Even if the fear of a victim is to be judged by an objective rather than a subjective standard, which we do not here decide, the evidence is sufficient to show intimidation within the meaning of the statute. Beverly's fear was based on Raymond's repeated attempts to have sexual intercourse with her, the warning voiced by Virginia that she would be returned to her father unless she submitted to Raymond, and her observation of Raymond's violent propensities and anger. Raymond believed her when she said she had been beaten by her father. Raymond testified that the Suttons took her into their home to remove her from her father's physical abuse. Raymond said that he would never have forced her to return to her father against her will but there is no evidence that he so informed her. It is apparent that he was aware of her fear of her father and believed her fear to be reasonable. In the Suttons' home where she sought sanctuary, however, she found herself aggressively importuned by a middle-aged soldier who with his wife exercised custodial control over her.

The evidence shows that an atmosphere of fear was developed and maintained by the Suttons to intimidate this 15-year-old physically handicapped girl and that her fear of bodily harm was reasonable. We hold that the evidence is sufficient to affirm Raymond's conviction of rape.

## 2. *Virginia Gray Sutton.*

Virginia Sutton was convicted of rape as a principal in the second degree. Principals in the second degree and accessories before the fact may be indicted, tried, convicted, and punished as principals in the first degree. Code § 18.2-18; *Riddick* v. *Commonwealth,* 226 Va. 244, 248, 308 S.E.2d 117, 119 (1983). To sustain Virginia's conviction as a principal in the second degree, it must be established that the offense was committed by Raymond as principal in the first degree. *See Sult* v. *Commonwealth,* 221 Va. 915, 918, 275 S.E.2d 608, 609 (1981). But the fact that she is incapable of committing the offense as a principal in the first degree does not absolve her of criminal liability for aiding and abetting Raymond in commission of the offense. *See Adkins* v. *Commonwealth,* 175 Va. 590, 600-01, 9 S.E.2d 349, 353 (1940).

To establish Virginia as a principal in the second degree, the Commonwealth was required to prove that she was present, either actually or constructively, when the rape was committed.[2] *See Spradlin v. Commonwealth,* 195 Va. 523, 526, 79 S.E.2d 443, 445 (1954); *Foster v. Commonwealth,* 179 Va. 96, 99, 18 S.E.2d 314, 315 (1942). Presence alone, however, is not sufficient to make Virginia a principal in the second degree. It must also be established that she procured, encouraged, countenanced, or approved Raymond's commission of the crime; she must have shared his criminal intent or have committed some overt act in furtherance of the offense. *See Augustine v. Commonwealth,* 226 Va. 120, 124, 306 S.E.2d 886, 888-89 (1983); *Hall v. Commonwealth,* 225 Va. 533, 536, 303 S.E.2d 903, 904 (1983). Virginia Sutton's actions meet these requirements for a principal in the second degree to rape as that crime is now defined by Code § 18.2-61.

The trial judge found, from undisputed evidence, that Virginia solicited Beverly to have sexual intercourse with Raymond. The judge also found that both Virginia and Raymond knew that Beverly was afraid to go back to her father. By preying on that fear, Virginia applied relentless pressure on Beverly to submit to Raymond. Shortly before July 23, Virginia reproached Beverly for refusing to submit to Raymond and threatened to return her to her father if she maintained the attitude that she was "too good to go to bed with [her] uncle." On July 22, Virginia and Raymond took Beverly to get birth control pills and paid for the purchase. When Raymond and Beverly had intercourse the following night, Beverly testified, she was afraid that Virginia would send her back to North Carolina.

During the rape, Virginia was not physically present but was in bed in another room. Nevertheless, her malevolent, intimidating influence on her niece was present and continued unabated. This evidence is sufficient to establish Virginia's constructive presence during the commission of the crime. Long ago, this Court said in

---

[2] Presence is the factor distinguishing a principal in the second degree from an accessory. An accessory is one who is absent during the commission of the crime but who has participated as a contriver, instigator, or advisor. *See McGhee v. Commonwealth,* 221 Va. 422, 425-26, 270 S.E.2d 729, 731 (1980); *Tolley v. Commonwealth,* 216 Va. 341, 348, 218 S.E.2d 550, 555 (1975); *Foster v. Commonwealth,* 179 Va. 96, 99, 18 S.E.2d 314, 315 (1942).

*Dull's Case,* 66 Va. (25 Gratt.) 965, 977 (1875), of constructive presence:

> the *presence* need not be a strict, actual, immediate presence, such a presence as would make [the defendant] an eye or ear witness of what passes, but may be a constructive presence. So that if several persons set out together . . . upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each takes the part assigned him; . . . they are all, provided the fact be committed, in the eyes of the law, present at it. . . .

(quoting 1 Russell on Crimes 27 (3d ed. 1845)).

In this case, Virginia and Raymond discussed Raymond's desire to have intercourse with Beverly and Beverly's resistance. They embarked on a common purpose of inducing Beverly by intimidation to submit to Raymond's advances. Virginia's part in the scheme was to so overcome Beverly with the prospect of returning to North Carolina and a life of physical abuse that she would no longer refuse Raymond's demands. By her reprimands of Beverly and her warning about the consequences of continued resistance, Virginia executed her part in the crime and helped ensure the success of their common enterprise.

The evidence also adequately establishes that Virginia shared Raymond's criminal intent and committed overt acts in furtherance of the crime. She and Raymond were determined to have Beverly submit. They knew her fear of her father and could have intended no less than to coerce her submission by their threat to return her to him. Virginia contends that she did no more than encourage Beverly to consent, but the very nature of the inducements she used contradicts this argument. She did more than urge consent when, by stating the alternative, she placed Beverly in the untenable position of submitting against her will or risking physical injury at her father's hand. Coerced submission is not consent, and Virginia's purpose was to achieve such submission. Her motive, showing the depths of her depravity, is revealed in her determination to see her husband and her niece engage in sexual intercourse so that she could help Beverly improve her technique.

Nor can Virginia argue that statements she made several days prior to the rape incident were too removed to constitute intimidation during the crime. The threat of being sent home was

an ongoing force in a series of repeated confrontations with Raymond. The warning was not limited to one specific encounter but was intended to, and in fact did, induce submission to a continuing sexual relationship. As such it was sufficiently close to the events of July 23 to instill fear in Beverly and induce her submission. Because she procured, encouraged, countenanced, and approved Raymond's having sexual intercourse with Beverly against her will by intimidation, the trial court properly found her guilty of rape as a principal in the second degree.

Accordingly, we will affirm both convictions.

*Affirmed as to Record No. 831787.*
*Affirmed as to Record No. 831788.*

POFF, J., concurring.

I agree that the convictions in both cases should be affirmed, but I disagree with the constructive-presence rationale in the case of Virginia Sutton.

She was indicted as a principal in the second degree. But the evidence at trial showed that, because she was absent when the felony was committed, she was an accessory before the fact. *McGhee v. Commonwealth,* 221 Va. 422, 425-26, 270 S.E.2d 729, 731 (1980).* At common law, an accessory before the fact to a felony could not be convicted under an indictment charging him as a principal, and this Court held in *Thornton v. Commonwealth,* 65 Va. (24 Gratt.) 657, 669-70 (1874), that this rule had survived legislative change. This holding was affirmed and applied in *Hatchett v. Commonwealth,* 75 Va. (1 Matt.) 925, 931-32 (1882).

At the time those cases were decided, however, the relevant statute provided that "in the case of every felony, every principal in the second degree, and every accessory before the fact, shall be punishable as if he were the principal in the first degree." *Thornton* at 669. The decisions in *Thornton* and *Hatchett* were based

---

* She was not a principal in the second degree because, as the majority notes, she "was in bed in another room" when the felony was committed and, so far as the record shows, was unaware of its occurrence.

At common law, constructive presence by a principal in the second degree meant active participation in some phase of the criminal activity *as it was carried out.* This contemporaneous participation in the context of an ongoing criminal event is what distinguishes the principal from the accessory before the fact.

*State v. Thibodeau,* 353 A.2d 595, 605-06 (Me. 1976) (emphasis in original).

upon the substantive difference the Court noted between the Virginia statute and the English statute which provided that "if any person shall become an accessory before the fact to any felony . . . such person may be indicted, tried, convicted and punished, in all respects as if he were a principal felon." *Thornton* at 670. Both Courts decided that, while the English statute was broad enough to abolish the distinction between a principal in the second degree and an accessory before the fact, the Virginia statute did not go so far.

In 1936, the General Assembly amended the old statute. Acts 1936, c. 350. As amended, the statute, now Code § 18.2-18, provides that, in the case of every felony except a capital offense, "every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Since the amendment renders the Virginia statute substantially equivalent to the English statute, it is fair to conclude that the General Assembly, prompted by the opinions in *Thornton* and *Hatchett,* intended by the amendment to abolish the common-law distinction.

The distinction was based solely upon the presence of the accused at the commission of the crime. Two things equal to a third are equal to each other. If, as the legislature has provided, an accessory before the fact to a felony and a principal in the second degree can be indicted, convicted, and punished in all respects as a principal in the first degree, the common-law distinction is meaningless, presence is no longer relevant, and it is immaterial that Virginia Sutton was absent when the felony was committed.

STEPHENSON, J., dissenting in Record No. 831788.

I agree that the evidence is sufficient to support Raymond Sutton's conviction. I do not agree, however, that the evidence is sufficient to convict Virginia Sutton as a principal in the second degree.

An accessory before the fact is one who is absent at the commission of the offense but is " 'in some way concerned therein . . . as [a] contriver, instigator or advisor.' " *Tolley* v. *Commonwealth,* 216 Va. 341, 348, 218 S.E.2d 550, 555 (1975) (quoting *Foster v. Commonwealth,* 179 Va. 96, 99, 18 S.E.2d 314, 315 (1942)). *See also McGhee* v. *Commonwealth,* 221 Va. 422, 425-26, 270 S.E.2d 729, 731 (1980). On the other hand, a principal in the second

degree is one who is present at a crime's commission and commits some overt act, such as inciting, encouraging, advising, or assisting in its commission or shares the perpetrator's criminal intent. *Moehring* v. *Commonwealth,* 223 Va. 564, 567, 290 S.E.2d 891, 892 (1982). Thus, there is a clear distinction between the two offenses. In the former, the accused must be absent during commission of the principal offense; in the latter, the accused must be present.

It is true, as the majority states, that when one is indicted as a principal in the second degree, proof of mere *constructive* presence, as opposed to *actual* presence, is sufficient. To constitute constructive presence, however, there must be evidence that the accused is keeping watch or guard "at proper distances and stations, to prevent a surprise, or to favor, if need be, the escape of those who are more immediately engaged." *Dull's Case,* 66 Va. (25 Gratt.) 965, 977 (1875). *See also Ward* v. *Commonwealth,* 205 Va. 564, 568, 138 S.E.2d 293, 296 (1964); *Snyder* v. *Commonwealth,* 202 Va. 1009, 1015, 121 S.E.2d 452, 457 (1961).

Virginia Sutton was not indicted as a principal in the first degree* or as an accessory before the fact. Instead, she was indicted as "a principal in the second degree to rape." Therefore, an essential element of the offense charged was her presence at the crime's commission.

The record is devoid of any evidence of the accused's presence, actual or constructive. To the contrary, the undisputed evidence establishes that at all times before and during the commission of the offense, she was in another room, in bed, and quite probably asleep. There is no evidence that she even knew that the crime was being committed, and, clearly, she was not so situated that she could keep watch or guard "to prevent a surprise, or to favor, if need be, the escape of [her husband]."

Although Virginia Sutton's conduct was reprehensible, in my opinion, the evidence is insufficient to prove beyond a reasonable doubt that she was a principal in the second degree. Therefore, I would reverse her conviction and dismiss the indictment.

COMPTON, J., joins in dissent.

---

* Had she been indicted as a principal in the first degree, she could have been convicted as an accessory before the fact. *See* Code § 18.2-18, which reads in pertinent part: "In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; . . . ."