COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Annunziata and Clements
Argued at Alexandria, Virginia


RICHARD LEE PAIGE

MEMORANDUM OPINION[*] BY

v.    Record No. 1444-02-4      JUDGE JEAN HARRISON CLEMENTS
                                       SEPTEMBER 30, 2003

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Burke F. McCahill, Judge

John C. Cherry, III, for appellant.

Jennifer R. Franklin, Assistant Attorney
General (Jerry W. Kilgore, Attorney General,
on brief), for appellee.


Richard Lee Paige was convicted in a jury trial of

distribution of cocaine, in violation of Code § 18.2-248. On

appeal, he contends the trial court erred in denying his motion to

strike the distribution of cocaine charge on the ground that the

evidence was insufficient, as a matter of law, to sustain his

conviction as a principal in the second degree. Finding the

evidence sufficient, we affirm the conviction.

As the parties are fully conversant with the record in this

case and because this memorandum opinion carries no precedential

value, this opinion recites only those facts and incidents of the

    * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

proceedings as are necessary to the parties' understanding of the disposition of this appeal.

I. BACKGROUND

In accordance with familiar principles of appellate review, we "state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." Johnson v. Commonwealth, 259 Va. 654, 662, 529 S.E.2d 769, 773 (2000).

On August 25, 2000, officers from the Loudoun County Sheriff's Office were conducting a narcotics investigation at the Community Plaza Shopping Center in Loudoun County. As part of that undercover operation, the officers set up a "controlled buy" in an attempt to apprehend individuals suspected of distributing crack cocaine in the area. A "controlled buy" occurs when a private citizen, called a "cooperating individual" (C.I.), works with the police to purchase contraband from a suspect, under controlled circumstances. Specifically, the C.I. is searched prior to the transaction to insure he has no money or contraband with him. The C.I. is then given a specific amount of "buy money" with which to purchase the contraband and is "wired" with a microphone and transmitter so that the transaction can be monitored by the police. After the transaction, the C.I. returns to the police and is searched again. Any drugs purchased by the C.I. are recovered by the police.

Investigator Ken Dondero, the lead officer of the investigation, testified that, prior to the transaction, he met with the C.I. involved in the operation in a remote area near the Community Plaza Shopping Center. The C.I. then made a recorded telephone call to the residence of a suspect, not Paige, and spoke to Gilbert Johnson and James Neal. Dondero, who was monitoring the C.I.'s conversation, was familiar with Neal "from previous deals." During the conversation with Neal, the C.I. asked to purchase two "8 balls" of crack cocaine. An "8 ball" is approximately one-eighth of an ounce of crack cocaine. The C.I. agreed to meet Neal for the "buy" in fifteen minutes at the Shoppers Food Warehouse located in the Community Plaza Shopping Center.

When the call was concluded, Dondero searched the C.I., gave him $250 with which to make the "buy," and "wired" him with an "electronic monitoring device" consisting of a microphone and transmitter. Dondero then drove the C.I. to the far end of the Community Plaza Shopping Center and dropped him off. Monitored by Dondero, the C.I. walked to the other end of the shopping center and waited in front of the Shoppers Food Warehouse.

Other officers were positioned around the shopping center for surveillance. Sergeant William Nugent was responsible for the audio and video surveillance of the "controlled buy." From inside an enclosed vehicle in the store's parking lot, he used a receiver to monitor the C.I.'s transmitter and a periscope video camera

- 3 -

with zoom capability to shoot the C.I.'s activities. Using that equipment and a video recorder, Nugent made a videotape of the transaction. The videotape, which was admitted into evidence and viewed by the jury at trial, recorded what Nugent saw through the camera and the sounds picked up by the C.I.'s microphone and transmitted to Nugent's monitoring equipment.

After dropping the C.I. off at the shopping center, Dondero parked his car in a space near the Shoppers Food Warehouse, from which he "had a good view of the C.I." While sitting in his car, he observed Neal approach the C.I. on foot and engage him in conversation. Shortly thereafter, Dondero noticed a man, later identified as Paige, walking near his car. Dondero observed Paige "wander[ing] through the parking lot" and holding his hand up to his face "as if he was speaking on a cell phone." According to Dondero, Paige was "looking around the parking lot, acting suspiciously." Dondero notified the other officers on the scene that Paige could be a "lookout" for Neal because he "was observing everything in the parking lot, [walking] not [in] any real direction, just wandering around, looking around to see who else might be on the lot or see who might be watching him or other people." Dondero advised the other officers that, in light of his suspicious behavior, Paige bore watching to "see if he ha[d] anything to do with [the transaction]."

Eventually Paige walked up to Neal and the C.I., prompting the C.I. to ask Neal if Paige was his "partner." After a cursory

- 4 -

exchange with the two men, Paige continued walking. The C.I. then handed Neal an item, which Dondero believed was the "buy money" he had given him earlier. A moment later, Paige again walked up to Neal and the C.I. After a brief conversation with Neal, Paige walked away. At Neal's direction, the C.I. then walked to Neal's "brown truck," which was parked in the parking lot, and stood beside it. After a while, Neal and Paige, walking together, approached Neal's truck.

When Neal and Paige arrived at Neal's truck, the following exchange occurred:

> C.I.: Do you all do insulation?
>
> Neal: Yeah.
>
> C.I.: Do ya? Shit, we're always looking for help.
>
> Paige (opening the passenger door of the truck for the C.I.): Come on.
>
> C.I.: I ain't getting in with you all. I don't know you, man. For real.
>
> Paige: You gonna wait right here for us?
>
> C.I.: Oh . . ., man.
>
> Neal (sitting in the driver's seat of the truck): I be back, I be back, I be back in twenty minutes, man.
>
> Paige: Man, everything's cool, man. It ain't even got to be going like that.
>
> Neal: I can be back in twenty minutes.
>
> Paige: Another twenty minutes, I got it waiting on the corner for you, right? Ain't nobody going to bullshit you.

    Paige (getting in the passenger seat of the
    truck):  I don't care, I mean . . .

At that point, Neal started the truck, which drowned out the
continuing exchange.  Eventually, the C.I. stated, "All right,"
and started walking back to the front of the Shoppers Food
Warehouse.  Neal and Paige then drove off in the truck.

At that juncture, Investigator John Dodson, who had been
observing the transaction, began a "mobile surveillance" of Neal's
truck.  He followed the truck out of the parking lot and tailed it
for approximately ten minutes to an apartment complex on Brethour
Court in the Sugarland Run subdivision.  There, Dodson observed
Paige exit the vehicle, walk across a parking area, and enter the
apartment complex through the stairwell of Building 1405.  "[A]
couple minutes later," Dodson saw Paige re-emerge from the
apartment complex and return to the truck.  Once Paige was back in
the truck's passenger seat, Neal and he drove away.  Dodson
followed the truck back to the area of the Shoppers Food
Warehouse.

When the truck turned into the entrance of the shopping
center parking lot, Dodson observed Paige get out of the truck and
begin to walk eastbound on an access road that was parallel to
Route 7.  Dodson estimated that the access road was "a couple
hundred yards" away from the front of the Shoppers Food Warehouse
where the C.I. was standing.  Dodson then observed Neal

immediately continue on in the truck toward the front of Shoppers Food Warehouse.

Approximately twenty minutes after Neal and Paige had left the area in Neal's truck, Investigator Dondero, who had continued his surveillance of the C.I., observed Neal's truck return to the Shoppers Food Warehouse parking lot. Neal was alone in the truck. Neal pulled up to the curb in front of the Shoppers Food Warehouse where the C.I. was waiting. Dondero testified and the videotape confirms that what "appeared to be an exchange" then took place. The C.I. leaned through the passenger side window of Neal's truck, "as if grabbing something," and, after a brief conversation with Neal, "came back out" of the truck. Neal then drove away.

Dondero picked up the C.I. and retrieved from him the item purchased from Neal, a "corner of a napkin" containing a substance later determined to be crack cocaine. Thereafter, Dondero searched the C.I. and found no other contraband or any of the "buy money" on him.

Paige was indicted for distribution of cocaine, in violation of Code § 18.2-248. At trial on that charge, the Commonwealth proceeded against Paige solely on the theory that he was a principal in the second degree in the distribution of the cocaine to the C.I. Upon the conclusion of the Commonwealth's evidence, Paige moved to strike the charge against him on the ground the Commonwealth's evidence was insufficient to prove he had any involvement in the actual distribution of the cocaine to the C.I.

The evidence, he argued, did not show he was present at the scene of the distribution or that he assisted Neal in the commission of the crime. The Commonwealth argued the evidence was sufficient because it proved Paige was present for a "substantial portion" of the illegal transaction and that he overtly aided and abetted Neal in the commission of the crime. The trial court denied the motion, without explanation, and Paige rested without presenting any evidence. Making no additional argument, Paige renewed his motion to strike, which the trial court again denied without explanation. The jury subsequently found Paige guilty of distribution of cocaine, as charged, and this appeal followed.

## II. ANALYSIS

When the sufficiency of the evidence is challenged on appeal, we review the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1997). We are further mindful that the "credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." Crawley v. Commonwealth, 29 Va. App. 372, 375, 512 S.E.2d 169, 170 (1999). We will not disturb the conviction unless it is plainly wrong or unsupported by the evidence. Sutphin v. Commonwealth, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

- 8 -

Paige acknowledges, on appeal, that Neal distributed cocaine to the C.I. on August 25, 2000. He contends, however, that the trial court erred in denying his motion to strike the distribution of cocaine charge against him, because the evidence is insufficient as a matter of law to prove beyond a reasonable doubt that he participated as a principal in the second degree in the distribution of cocaine by Neal. Specifically, Paige argues, as he did at trial, that the evidence did not show he was present at the scene of the crime or that he assisted Neal in committing the crime. We disagree.

The Commonwealth prosecuted Paige in this case solely under the theory that he was a principal in the second degree in Neal's distribution of the cocaine to the C.I.[1] "[I]n Virginia[,] a principal in the second degree is held as culpable as one in the first degree" and is, therefore, subject to the same punishment as a principal in the first degree. Briley v. Commonwealth, 221 Va. 563, 573, 273 S.E.2d 57, 63 (1980); Code § 18.2-18. To hold

_____

[1] Nothing in the record reveals why the Commonwealth chose to proceed against Paige solely on the theory that he was a principal in the second degree. Because, pursuant to Code § 18.2-18, a principal in the second degree and an accessory before the fact "may be indicted, tried, convicted and punished in all respects as if a principal in the first degree," the Commonwealth is not required to elect between those two theories and, depending on the evidence, a defendant may be convicted under either theory, thus, essentially rendering the issue of the defendant's presence at the commission of the crime moot. See Ward v. Commonwealth, 205 Va. 564, 568, 138 S.E.2d 293, 296 (1964); see also Sutton v. Commonwealth, 228 Va. 654, 670 n.*, 324 S.E.2d 665, 674 n.* (1985) (Stephenson, J., dissenting in Record No. 831788).

an accused accountable as a principal in the second degree, the Commonwealth must prove the accused was "present, aiding and abetting, by helping some way in the commission of the crime." Ramsey v. Commonwealth, 2 Va. App. 265, 269, 343 S.E.2d 465, 468 (1986). Actual presence at the commission of the crime, however, is not required to convict the accused as a principal in the second degree. The accused need only be constructively present at the crime's commission. See Sutton v. Commonwealth, 228 Va. 654, 666, 324 S.E.2d 665, 671 (1985) (Stephenson, J., dissenting in Record No. 831788). As the Supreme Court stated in Sutton:

> "'[T]he presence need not be a strict, actual, immediate presence, such a presence as would make [the defendant] an eye or ear witness of what passes, but may be a constructive presence. So that if several persons set out together . . . upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each takes the part assigned him; . . . they are all, provided the fact be committed, in the eyes of the law, present at it . . . .'"

Id. at 667, 324 S.E.2d at 672 (second alteration in original) (quoting Dull v. Commonwealth, 66 Va. (25 Gratt.) 965, 977 (1875) (emphasis added) (quoting 1 Russell on Crimes 27 (3d ed. 1845))).

Here, the record plainly shows that Paige was not actually present when Neal transferred the cocaine to the C.I. directly in front of the Shoppers Food Warehouse store. The evidence establishes that, at the time the cocaine was distributed, Paige was "a couple hundred yards" away from the scene of the

distribution, walking near the shopping center's entrance on an access road that was parallel to Route 7. The question remains, however, whether the evidence was sufficient nevertheless to sustain Paige's conviction of distribution of cocaine as a principal in the second degree. We believe the Supreme Court's decisions in Sutton and Grant v. Commonwealth, 216 Va. 166, 217 S.E.2d 806 (1975) (per curiam), govern the resolution of that question.

In Sutton, both Mr. and Mrs. Sutton were convicted of raping Mrs. Sutton's niece, a minor who was living with them because her father had beaten her. Sutton, 228 Va. at 658, 660, 324 S.E.2d at 667, 668. Mrs. Sutton was convicted of rape as a principal in the second degree. Id. at 658, 324 S.E.2d at 667. The evidence in the case established that, on various occasions prior to the actual rape itself, Mrs. Sutton told the victim that she would get over her fear of men if she had sexual intercourse with Mr. Sutton, id. at 659, 324 S.E.2d at 667, and that she would have to return to her abusive father if she did not have sexual intercourse with Mr. Sutton, id. at 660, 324 S.E.2d at 668. One day after the Suttons took the victim to get birth control pills, Mr. Sutton had sexual intercourse with the victim. Id. The victim did not physically resist because she was afraid that, among other things, the Suttons would return her to her father. Id.

During the rape itself, however, Mrs. Sutton "was not physically present but was in bed in another room." Id. at 666, 324 S.E.2d at 672. Indeed, as Justice Stephenson noted, "at all times before and during the commission of the offense, [Mrs. Sutton] was in another room, in bed, and quite probably asleep. There [was] no evidence that she even knew that the crime was being committed . . . ." Id. at 670, 324 S.E.2d at 674 (Stephenson, J., dissenting in Record No. 831788). Nevertheless, the majority held that the evidence was sufficient to establish Mrs. Sutton's "constructive presence during the commission of the crime," id. at 666, 324 S.E.2d at 672, to prove that Mrs. Sutton assisted Mr. Sutton in the commission of the crime, id. at 667-68, 324 S.E.2d at 672, and to convict Mrs. Sutton as a principal in the second degree, id. at 668, 324 S.E.2d at 672.

The Court reasoned in Sutton as follows:

> In this case, [Mrs. and Mr. Sutton] discussed [Mr. Sutton's] desire to have intercourse with [the victim] and [the victim's] resistance. They embarked on a common purpose of inducing [the victim] by intimidation to submit to [Mr. Sutton's] advances. [Mrs. Sutton's] part in the scheme was to so overcome [the victim] with the prospect of returning to [her father] and a life of physical abuse that she would no longer refuse [Mr. Sutton's] demands. By her reprimands of [the victim] and her warning about the consequences of continued resistance, [Mrs. Sutton] executed her part in the crime and helped ensure the success of their common enterprise.

Id. at 670, 324 S.E.2d at 674.

In Grant, the accused was convicted of robbery based on evidence that, shortly after the robbery, he was seen driving a car with the two assailants who had committed the actual robbery as his passengers. Grant, 216 Va. at 167, 217 S.E.2d at 807. In considering the sufficiency of the evidence to sustain Grant's conviction, the Supreme Court held as follows:

> While there is no direct evidence that the defendant was present at the scene of the robbery and actively participating in the crime, the circumstantial evidence points unerringly to his guilt as an aider and abettor of the offense. We believe the evidence permits the reasonable inference that, while the robbery was in progress, the defendant, at some convenient distance from the scene, was serving as a lookout, waiting to aid the robbers in their escape. The evidence permits the further inference that, following the robbery, the defendant acted as the driver of the "getaway" car in the abortive escape attempt. Accordingly, he was properly convicted as a principal in the second degree.

Id. at 168-69, 217 S.E.2d 808.

Applying the Supreme Court's rationale in Sutton and Grant to the evidence before us, we conclude that the evidence was sufficient to show that, although not actually present at the crime's commission when the distribution of cocaine took place, Paige was constructively present at the crime's commission and was aiding and abetting Neal, "by helping some way in the commission of the crime." Ramsey, 2 Va. App. at 269, 343 S.E.2d at 468. Viewed in the light most favorable to the Commonwealth, the evidence, and the reasonable inferences fairly deducible from it,

- 13 -

establish that Neal and Paige came to the parking lot at Shoppers Food Warehouse in response to the C.I.'s request to buy cocaine from Neal. Their common purpose was to make money by successfully selling cocaine to the C.I. and perhaps gain a steady customer in the process. While Neal and the C.I. discussed the "buy," Paige, serving as a lookout, cased the parking lot, with his cell phone in hand, to make sure the transaction was not a trap. Only after speaking with Paige did Neal take the "buy money" from the C.I. and direct him to his truck. When the C.I. refused Paige's invitation to get in the truck and accompany them to the source of the cocaine, Paige assured the doubting C.I. that the deal was legitimate and would be consummated shortly. Paige, whose role in the scheme at that point was to secure the success of the transaction by convincing the skeptical buyer to wait for them, told the C.I. that "nobody [was] going to bullshit" him and that he had the cocaine "waiting on the corner." Paige and Neal repeated they would be back in twenty minutes with the cocaine.

At Brethour Court, Paige alone entered the apartment complex, and obtained the cocaine that was to be distributed to the C.I. When he returned moments later to Neal's truck, Neal and he returned to the Shoppers Food Warehouse parking lot. After dropping Paige off near the entrance of the parking lot, approximately two hundred yards from where the C.I. was waiting, Neal immediately drove to the front of the store and delivered the cocaine to the C.I.

- 14 -

This evidence adequately establishes Paige's role as a confederate of Neal in their common enterprise to sell cocaine to the C.I. Neal's role was to negotiate the sale with the C.I., collect the purchase price, and deliver the drugs in return. The various roles assigned to and executed by Paige during the transaction were no less meaningful. But for his encouragement, persuasion, and other assistance, the transaction would not have taken place.

Hence, in light of Paige's extensive involvement in the common enterprise, including his stint in the parking lot as a lookout, and the fact that, having been dropped off by Neal immediately prior to the transfer of the cocaine to the C.I., Paige was located near the entrance to the parking lot only two hundred yards away from the scene of the crime, the jury was entitled to find by inference that Paige had been posted as a lookout at a convenient distance from the scene to make sure that Neal was not followed into or out of the parking lot and that the distribution itself occurred without any problems. The jury was further entitled to find from the evidence that, when the distribution of cocaine took place, Paige was discharging his lookout duties.

We conclude, therefore, that the evidence is sufficient, as a matter of law, to support the finding beyond a reasonable doubt that Paige participated in the distribution of cocaine to the C.I. as a principal in the second degree.

Paige also argues that, because he was not observed obtaining the cocaine inside the apartment complex or with the cocaine in his possession, the merely circumstantial evidence of the Commonwealth did not exclude the reasonable hypothesis of innocence that the cocaine was in Neal's sole possession at all times. We find this argument meritless. "Whether an alternative hypothesis is reasonable is a question of fact, and, therefore, is binding on appeal unless plainly wrong." Archer v. Commonwealth, 26 Va. App. 1, 12-13, 492 S.E.2d 826, 832 (1997). Paige suggests that Neal and he left the shopping center parking lot to test the C.I.'s resolve. He further suggests the possibility that he went into the apartment complex for a reason other than to procure cocaine. Here, however, there was no evidence to support either suggestion. The only hypotheses of innocence "which must be . . . excluded are those which flow from the evidence itself, and not from the imaginations of defense counsel." Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983).

Accordingly, we hold that Paige was properly convicted of distribution of cocaine as a principal in the second degree and affirm the conviction.

Affirmed.