COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judge Annunziata and
        Senior Judge Overton
Argued at Chesapeake, Virginia


MICHAEL EDWARD BENYO
                                            OPINION BY
v.   Record No. 1933-01-1        JUDGE ROSEMARIE ANNUNZIATA
                                         AUGUST 20, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
                      D. Arthur Kelsey, Judge

          Timothy E. Miller, Public Defender, for
          appellant.

          Susan M. Harris, Assistant Attorney General
          (Jerry W. Kilgore, Attorney General, on
          brief), for appellee.


     On June 22, 2001, Michael Edward Benyo was convicted at a

bench trial of two counts of raping his stepdaughter, in

violation of Code § 18.2-61.  He was sentenced to twelve years

in prison on each count, with ten years suspended on each count,

for a total of four years to serve.  He appeals on the ground

that the evidence was insufficient to support the convictions.

For the reasons that follow, we affirm.

                          Background

     When H., the victim in this case, was eight years old,

Benyo, who was about thirty-five years old, married her mother.

H. had been "looking for a father figure" because her "real Dad

didn't pay a lot of attention to her" and "was cold."  Benyo
testified that he "accepted her as a daughter absolutely and
totally."  She called Benyo dad, and he disciplined her.

When H. was about thirteen years old, Benyo first "had a
thought" about her.  While they were fishing, he told her to use
a cup to urinate and then "paddled as far into the bushes as
[he] could [and thought] [s]he's growing up, what am I supposed
to do about that."  From that point on, he "encourage[d] her to
wear less [by telling her] it's good for you, like you talk to
small babies, the best thing they could do was not wear
underwear cuz of a diaper rash.  She would wear [only] a shirt."
The defendant started "massaging" H. and "just got carried
away."  "Most of the time, H. would take her clothes off," and
he would "massage" her whole body, including her vagina, breasts
and buttocks.  He massaged her about six times a month when he
"knew mom wasn't going to be there."

When H. was fourteen, Benyo first inserted his finger
inside her vagina.  He could not remember when he first "had
oral sex with [his] stepdaughter," but guessed that he had
sodomized her thirty times.  She never sodomized him.  To
satisfy himself, Benyo would masturbate with his stepdaughter in
the room.  He would put a "towel underneath [them] [and] ball it
up and [throw] it in the laundry or [throw] it in the washing
machine."

-

Beginning when H. was fifteen, Benyo's sexual assaults included rape. At trial, he admitted that he had intercourse with his stepdaughter "more than ten times" and that he only had sex with her when her "mother was out of town," which was memorialized on a calendar.

Benyo claimed, "at least in the beginning," that he would stop if H. asked him to. Later, when H. told Benyo that "she didn't want to," he "would put a guilt trip on her," or "just power her." If she "got upset and scared," he would say "this was our little secret and that [her] mom would be upset, . . . might not believe [her] and would be upset with [her], . . . [and that they] would both be in trouble, he would lose his job, and they would have no money." He also threatened that "there would be a chance that he would go to jail if someone knew."

H. testified that she never told Benyo she wanted to have intercourse with him. She said she "would try [to make him stop] or move away but he would continue." She did not feel she had the option to refuse to have intercourse with him. She testified that the intercourse "was against [her] will."

Benyo testified that he "certainly" intimidated H. into having sexual intercourse with him. Benyo explained the psychological pressure he used to intimidate his stepdaughter as follows:

-

> [H.] didn't want her mom to find out because
> she knew her mom was very happy having me as
> a husband and she didn't want to ruin that
> and her father was cold [to] her[.]  I think
> she would have done anything.  I didn't sit
> around and say I can use this as a lever or
> anything, but I'm sure that had something to
> do with it.

Benyo also testified that he always initiated their sexual encounters and that "H. [never] came to [him] before [he] went to her."

The evidence also proved that "towards the end," Benyo threatened H. with his suicide if she stopped having sex with him.  When H. "didn't want to do what [Benyo] wanted [her] to do," he told her:

> he had gotten some medication from a doctor
> in the Navy [and] that he would take it and
> he would commit suicide and he was writing
> my mother a note and wanted me to help him
> pick out his uniform that he would wear.

Benyo then took out his military uniform.  H. believed he was serious and feared that "[the family] would have no money and that my mother would be upset, and it would be my fault that [Benyo] had died."  She testified that she felt "scared" when Benyo would talk to her about attempting suicide.

One night when H. came home, she discovered "two bloody handprints on the sink."  Frightened, H. left the house as quickly as she could and went to the function where her mother and uncle were to tell them.  Benyo explained that he had cut

-

himself in the yard but left the mess to "find out H.'s reaction" and "whether she cared or not."

Benyo's abusive behavior toward H. continued while she visited her biological father during her thirteenth summer. He sent her a series of letters where he spoke of his "love" for H. He referred to himself as Priscilla and H. as Elvis. He told H. that when she returned home on Sunday he would give her a "giant bear hug, many kisses, and the most special back rub that circumstances will allow when I tuck you in."

In another letter, undated, Benyo asked H. to help him decide his "options concerning the future," because she was the "only one in the whole world who knows the whole story." He said one option was "to continue to take [his] medication [Paxil] and for [their] relationship to continue as it is." He explained that the medication prevented his "hurting anyone or myself." He also wrote that he "get[s] angry and hurt that [he] can't have [H.]. Then [he] get[s] angry at [himself] for feeling that way." He says another option is to "admit to the doctor what has really taken place between [them]," and adds, "[o]f course, [that] would land me in jail for a very long time and our marriage would certainly be destroyed by this as well."

These letters and the suicide threats "scared" H. such that she felt she could not say no or tell Benyo to stop. She believed she could not leave home in order to escape. She

-

thought her mother would not believe her and that her biological father would not help her.

From this evidence, the trial court concluded that H.'s "will was overborne by intimidation and therefore she did not consent to this sexual intercourse and therefore he is guilty as charged."

## Analysis

Benyo claims on appeal that the evidence was insufficient to prove he intimidated H. into having sexual intercourse with him.  See Code § 18.2-61 (providing, in pertinent part, that one who has sexual intercourse against the will of a complainant, "by force, threat or intimidation" of the complainant shall be guilty of rape).  Although Benyo admits he accomplished the intercourse through psychological pressure, he contends he did not put H. in fear of bodily harm.  Assuming, without deciding, that the evidence does not prove H. feared bodily harm, we note that, as a matter of law, proof of psychological pressure and "emotional domination [may be] sufficient to constitute intimidation."  Clark v. Commonwealth, 30 Va. App. 406, 410, 517 S.E.2d 260, 261-62 (1999).  Therefore, we affirm the decision of the trial court.

The Supreme Court has defined intimidation, in part, as resulting from "the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to

-

such pressure."  Sutton v. Commonwealth, 228 Va. 665, 663, 324 S.E.2d 665, 670 (1985); accord Commonwealth v. Bower, 264 Va. 41, 44, 563 S.E.2d 736, 737 (2002); Clark, 30 Va. App. at 410, 517 S.E.2d at 261-62.  Relevant factors include the "victim's age, the relative size of the defendant and the victim, and the vulnerable position of the victim."  Bower, 264 Va. at 46, 563 S.E.2d at 738.  In addition, the paternal relationship is highly relevant.  See Clark, 30 Va. App. at 410-11, 517 S.E.2d at 262.  "The paternal bond, along with the victim's age and relative isolation from others, [may] impede[] her ability to resist her father."  Id.

In Clark, we held that the following circumstances of emotional domination constituted intimidation:

> Clark began molesting [the victim] when she was very young. . . . Even after she learned the conduct was wrong, she allowed it to continue because she was unable to confront her father.  He was in poor health.  For many years, he had been her primary caregiver.  She had always gone to him when she had problems, because her mother was unreliable and was rarely accessible to her.  She thought that the other members of her family would reject her if she accused her ailing father.  She felt isolated, with nowhere to turn.

Id. at 410, 517 S.E.2d at 262.

Similarly, Benyo began to abuse H. when she was very young -- thirteen years old.  Benyo testified that he intimidated H. into having sexual intercourse with him.  He routinely isolated

-

H., waiting until her mother was out of town, to molest and ultimately rape her. When H. resisted, Benyo "would put a guilt trip on her, . . . just power her," or say things like "this [is] our little secret and [your] mom would be upset, . . . might not believe [you] and would be upset with [you], . . . [and we] would both be in trouble, [I] would lose [my] job, and [we] would have no money," and "[I could] go to jail if someone knew." He was aware H. did not want her mom to find out and used this as a lever to pressure her. Later, he told H. he would commit suicide if she ended the relationship.

As a result of this course of conduct, H. felt she had no option but to submit to intercourse with Benyo. She believed she could not leave home to escape his advances. She thought her mother would not believe her and that neither of her biological parents would help her. Moreover, she testified that she believed Benyo's suicide threats and was frightened by them. She feared that her family "would have no money and that [her] mother would be upset, and it would be [her] fault that [Benyo] had died."

These circumstances support a finding that Benyo's calculated course of psychological pressure and emotional domination, particularly the important relationship H. believed she and her mother had with Benyo, "[led H.] to submit to the overtures of [Benyo]." Bower, 264 Va. at 45, 563 S.E.2d at 738

-

(noting that "'good relationship' between parent and child can include the child's general obedience to the parent's direction").  Accordingly, we affirm Benyo's convictions for the rape of his stepdaughter.

<u>Affirmed.</u>
