COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges AtLee and Friedman
Argued at Fredericksburg, Virginia

JOHN PLEASANT JOHNSON, JR.

v.        Record No. 0639-22-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE RICHARD Y. ATLEE, JR.
MARCH 21, 2023

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
James A. Willett, Judge

Hasina A. Lewis (Lewis Law, PLLC, on brief), for appellant.

Mike Eaton, Assistant Attorney General (Jason S. Miyares, Attorney
General; Jonathan M. Larcomb, Assistant Attorney General, on
brief), for appellee.


John Pleasant Johnson, Jr., challenges the sufficiency of the evidence supporting his

convictions following a jury trial for attempted rape, in violation of Code § 18.2-61(A); three

counts of object sexual penetration by force, in violation of Code § 18.2-67.2(A)(2); aggravated

sexual battery, in violation of Code § 18.2-67.3(A)(4); and three counts of forcible sodomy, in

violation of Code § 18.2-67.1.[1]  Specifically, he argues that the Commonwealth failed to prove

that he accomplished such acts through force, threat, or intimidation.  We disagree and

consequently affirm the circuit court's judgment.

---

\* This opinion is not designated for publication.  *See* Code § 17.1-413.

[1] Johnson does not challenge his three convictions for indecent liberties with a child, in
violation of Code § 18.2-370, or three counts of aggravated sexual battery of a victim under the
age of thirteen, in violation of Code § 18.2-67.3(A)(1).

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

The victim in this matter is M.M.,[2] the daughter of Johnson's fiancée. M.M. has a younger brother and an older brother with autism. M.M. testified that she met Johnson when she was around five years old. At the time, Johnson was a homicide detective in Washington, D.C., and M.M. "thought he was pretty cool and different than . . . what [she] was used to." M.M. began spending more time with Johnson when she was in fourth or fifth grade, at which point she began to see him as a potential "father figure." M.M. and her family moved to live with Johnson at the beginning of M.M.'s fifth-grade year, and they lived in Prince William County while M.M. was in sixth through ninth grade. M.M. and Johnson became "really, really close" while M.M. was in sixth grade. Johnson was "like [her] dad"; she "could tell him anything. [She] went to him for anything." He helped with homework, went to school functions, brought her food, and took care of her when she was sick. He would talk to her when she did not have friends to confide in. By contrast, M.M. testified that her mother, who had a history of substance abuse,

---

[2] We refer to the minor complaining witness by her initials to maintain her privacy.

was often out of the house during this time "getting high," and her biological father was "in and out" of her life. M.M. saw her biological father only once while she was in seventh grade.

M.M. lost weight during the summer between sixth and seventh grade so that she would be bullied less at school. After that Johnson began to tell her that she was pretty and had "a nice body." Johnson's behavior escalated while M.M. was in seventh grade, when he "started to become more touchy." When M.M. was twelve years old, she was watching television with Johnson, and he touched her vagina over her clothes for the first time. M.M. felt "[n]ot good" and "disgusted," "felt like [she] made a mistake," and "was begging for forgiveness from God." Johnson told M.M. that it was "okay" and that she had not done anything wrong. He touched her vagina at least twice a month while she was in seventh grade, both under and over her clothes. This touching always occurred when M.M.'s mother was not home and her brothers were not in the room.

The following summer, after M.M.'s seventh-grade year, Johnson "started asking for more." He asked M.M. to "suck[] his penis" while he was rubbing her vagina and kissing her neck. Johnson "kept . . . talking about it" until M.M. "finally gave in." She performed oral sex on Johnson until he ejaculated into his hand. Johnson told M.M. she "was better than [her] mom." After this, M.M. went into her room, locked the door, and cried. She "didn't let anyone see any emotions" because she "didn't want them to question what was wrong." She "felt like [she] had to" give in to Johnson's advances because he held "most of the power" in the family. She could not remember if she told Johnson how she felt at the time.

While M.M. was in eighth grade, Johnson offered to perform oral sex on her. M.M. responded that she did not think she would like that. Johnson insisted that she would like it and physically moved M.M. on top of a futon, took her pants off, and placed his mouth and tongue on her vagina. M.M. "didn't like it" and "was squirming around" and trying to push his head

back.  Johnson eventually stopped, and M.M. put her pants back on and "acted like nothing happened."  She felt like Johnson wanted "control" over her.

Later during her eighth-grade year, Johnson attempted to penetrate M.M.'s vagina with his penis but could not get an erection.  She did not remember how she came to be naked, but she remembered hanging off the bed with her legs in the air while Johnson attempted to have sex with her.  M.M. testified that Johnson was often unable to achieve an erection when she gave him oral sex.  Johnson admitted at trial that he had erectile dysfunction but testified that he told M.M. about his condition when she asked him why her mother had sex with other men.

Johnson put his fingers in M.M.'s vagina "[m]ore than once."  The first time he did so, M.M. was in eighth grade.  She said "[i]t hurt" and she "didn't like it."  She moved around as if in pain and hoped that it would stop as soon as possible.  He stopped when she told him it hurt.

Johnson continued to engage in sexual acts with M.M. when she was in ninth grade but did so less frequently.  M.M.'s relationship with her boyfriend helped her realize that her relationship with Johnson "wasn't right."  When M.M. started to refuse Johnson's advances, Johnson offered her money in exchange for sex acts.  In April 2020, M.M. asked Johnson for money to buy her friend and boyfriend birthday presents.  Johnson proposed giving M.M. $80 on the condition that she give him oral sex four times and let him rub her vagina for ten minutes. He suggested that they repeat the deal every month.  She initially declined but later agreed to the deal because she feared her boyfriend would break up with her if she did not get him a nice birthday present.  M.M. set a timer for ten minutes while Johnson rubbed her vagina.  She was "just waiting to hear that noise, for the timer to go off."  She then gave him oral sex.  Around three days later, he electronically sent her $80.

M.M. did not tell anybody about Johnson's actions because she feared nobody would believe her and felt that she "didn't have anyone that [she] could talk to."  Johnson paid for her

family's home, clothes, and cars, so she was scared of "losing everything, [and her] family losing everything." M.M.'s mother confirmed they struggled financially and relied on Johnson to support the family. Moreover, M.M. was happy when she spent time with Johnson without sexual acts, "[s]eeing that there was . . . a good side to him" and that he "wasn't just all bad." She saw Johnson as her father figure; she longed for someone to spend time with because her brothers did not really talk to her and her mother was not home. Johnson gave her many gifts and at one time gave her a vibrator.

M.M. frequently acted out during eighth and ninth grade, including getting in trouble at school, skipping school, and fighting with her mother. She said she had "so much anger built up for so long" she "wound up building a shell from being molested" by Johnson. She "just stopped caring about people, and . . . stopped caring about [her]self." During ninth grade, M.M. had two or three physical altercations with her mother. During one such altercation, M.M.'s hand was scratched, resulting in her teacher notifying Child Protective Services. In April 2020, M.M. observed Johnson strike her brother because her brother did not want to get out of the swimming pool. M.M. wrote a note that year stating that she was having suicidal thoughts because of Johnson's abuse and that she no longer had the father-daughter relationship with Johnson that she once had. She wrote a second note approximately one month later that also expressed suicidal thoughts.

In May 2020, while M.M. was staying with her aunt, Tameka Mack, Mack discovered that M.M. was messaging Johnson late at night and became concerned about their relationship. Mack told M.M. that there were certain boundaries that stepfathers should not cross and that M.M. could tell Mack if anything was wrong. M.M. told Mack about the abuse later that night. Mack told M.M.'s mother and father and went to the police station to file a report.

The police arrested Johnson and collected his cell phone. Johnson had deleted all the messages from his cell phone. M.M. testified that Johnson told her to delete any messages between them and that he generally preferred to talk on the phone so that their conversations would not be recorded. M.M.'s phone showed consistent messages to and from Johnson up until the date M.M. told Mack about Johnson's abuse.

After Johnson's arrest, the family moved into a small apartment where M.M. and her mother shared a bedroom. The family no longer had a car; Johnson had paid for their housing and cars when he lived with them.

Later in May 2020, M.M. attempted suicide by taking some of Johnson's pills and was admitted to the hospital. She testified that she had received a text message that Johnson was being released and she was "scared."

At the close of the Commonwealth's case, Johnson moved to strike the evidence. He argued as relevant here, that the Commonwealth did not prove that he employed force, threat, or intimidation, as required to prove attempted rape, object sexual penetration, forcible sodomy, and aggravated sexual battery against M.M. The Commonwealth acknowledged that its evidence did not establish that Johnson had used force or threats, but contended that the evidence established the use of intimidation. The circuit court denied the motion to strike.

Johnson testified and denied attempting to insert his penis into M.M.'s vagina, touching or fondling her, allowing M.M. to touch or fondle him, or sexually assaulting her in any way. He testified that he sent M.M. money on the condition that she behave better toward her mother.

At the close of the evidence, Johnson renewed his motion to strike, which the circuit court denied. The jury found Johnson guilty of all counts. The jury recommended a total sentence of three-hundred sixty years' imprisonment, which the circuit court imposed, with thirty years suspended. Johnson now appeals.

II. ANALYSIS

A. *Standard of Review*

Each of Johnson's four assignments of error challenges the sufficiency of the evidence. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). Our inquiry is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)).

B. *Evidence of Intimidation*

Each of the convictions Johnson challenges on appeal requires the Commonwealth to prove that Johnson committed acts "by force, threat or intimidation." Code §§ 18.2-61(A) (rape), -67.1(A)(2) (forcible sodomy), -67.2(A)(2) (object sexual penetration), -67.3(A)(4) (aggravated sexual battery). Johnson does not challenge on appeal the credibility of M.M.'s testimony but argues that her testimony was insufficient to establish that Johnson used force, threat, or intimidation in commission of these acts. The Commonwealth concedes that Johnson did not use force or threat but argues that he used intimidation.

"Intimidation . . . means putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will." *Bondi v. Commonwealth*, 70 Va. App. 79, 90 (2019) (alteration in original) (quoting *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985)). "Intimidation may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Id.* (quoting *Sutton*, 228 Va. at 663). Relevant factors include the "victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and

victim, and the vulnerable position of the victim." *Id.* (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)). "[P]roof that the victim feared some type of bodily harm other than the harm inherent in the sexual assault" is not required. *Bower*, 264 Va. at 46.

Appellate courts in Virginia have consistently found sufficient evidence of intimidation where the defendant stood in the role of father figure over the victim. As the Supreme Court has explained, "where the intercourse was induced through fear of a person whom the victim was accustomed to obey, such as a person standing in *loco parentis,*" the element of intimidation is likely present. *Sutton*, 228 Va. at 663. In *Bower v. Commonwealth*, the defendant sexually violated his thirteen-year-old daughter while she pretended to be asleep. 264 Va. at 43. The victim testified that "she had had a good relationship with her father prior to the assault." *Id.* The Supreme Court held that the good relationship between the defendant and victim "could lead the child to submit to the overtures of the parent because a 'good relationship' between parent and child can include the child's general obedience to the parent's direction." *Id.* at 45.

Similarly, in *Benyo v. Commonwealth*, 38 Va. App. 650, 651-52 (2002), the defendant sexually molested his stepdaughter numerous times over several years. The defendant began molesting the victim when she was thirteen years old and was isolated from her mother, who was out of town when the abuse occurred. *Id.* at 652. The victim testified that she "had been 'looking for a father figure'" and "did not feel she had the option to refuse to have intercourse with" the defendant. *Id.* at 651-52. The defendant would threaten to commit suicide if she stopped having sex with him, so the victim feared that her family "would have no money and that [her] mother would be upset, and it would be [her] fault that [the defendant] had died." *Id.* at 653. Holding that "proof of psychological pressure and 'emotional domination [may be] sufficient to constitute intimidation,'" this Court found sufficient evidence to prove intimidation. *Id.* at 654 (alteration in original) (quoting *Clark v. Commonwealth*, 30 Va. App. 406, 410

(1999)); *see also Bondi*, 70 Va. App. at 91 (finding sufficient evidence of intimidation where the defendant was a youth pastor whom the adult victim viewed as "her mentor and father figure"); *Cairns v. Commonwealth*, 40 Va. App. 271, 295 (2003) (finding sufficient evidence of intimidation where the victim testified that "fighting [her stepfather] didn't really seem like an option," and she could not rely on her mother for protection).

*Clark v. Commonwealth* is particularly on point. There, this Court found sufficient evidence of intimidation where the victim felt unable to confront the defendant because, "[f]or many years, he had been her primary caregiver," "[s]he had always gone to him when she had problems, because her mother was unreliable and was rarely accessible to her," and "[s]he thought that the other members of her family would reject her if she accused her ailing father." 30 Va. App. at 410. This Court emphasized that the paternal relationship between the defendant and victim was "a highly relevant circumstance" that the jury could properly consider as evidence of intimidation. *Id.* at 410-11.

Considering these authorities, we conclude that the Commonwealth presented sufficient evidence of intimidation in this case.[3] As in many of the cases noted above, M.M. saw Johnson, a retired police officer, as her father figure. Like the victim in *Clark*, M.M. relied on Johnson as her primary caregiver and went to him with her problems because her mother was frequently unavailable, and M.M. felt isolated from the rest of her family. Although Johnson did not physically abuse M.M. other than the sexual assaults, M.M. did witness Johnson physically strike her brother. *Cf. Cairns*, 40 Va. App. at 295 (finding as evidence of intimidation that the victim

---

[3] Johnson relies on the unpublished case of *Stoudt v. Commonwealth*, Nos. 2386-98-4; 2387-98-4 (Va. Ct. App. Feb. 15, 2000), in which this Court found the evidence insufficient to prove intimidation. In *Stoudt*, both the victim and defendant were coworkers and there was no evidence that the victim was "particularly vulnerable to psychological domination" by the defendant. *Id.* at 6. *Stoudt*, therefore, involved very different facts than this case.

had seen the defendant punch the victim's brother). Johnson provided significant financial support to M.M. and her family, paying for their home, clothes, food, and cars, among other necessities. He withheld money from M.M., conditioning it upon her participation in sexual acts. M.M. testified that she succumbed to Johnson's sexual advances because she "felt like [she] had to" because Johnson held "most of the power" in the family, and she was scared of "losing everything." She noted that, after she reported his abuse, the family did, in fact, lose their home and the financial security Johnson provided.

It is reasonable to conclude that Johnson's paternal role, and his providing necessary financial support for M.M. and her entire family, exerted sufficient psychological pressure on M.M. to overcome her will and that M.M. was "vulnerable and susceptible to such pressure." *Bondi*, 70 Va. App. at 90 (quoting *Sutton*, 228 Va. at 663). Indeed, Johnson intentionally abused this dynamic by withholding money until M.M. agreed to let him sexually abuse her. In light of all this evidence, a reasonable jury could find beyond a reasonable doubt that Johnson accomplished his acts of sexual abuse by use of intimidation and that he was guilty of attempted rape, forcible sodomy, sexual penetration with an object, and aggravated sexual battery.

III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed*.