COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Fulton and White
Argued by videoconference


LEVYN HERBERT ANDRADE, A/K/A
  LEVYN ANDRADE, A/K/A
  LEVYN H. ANDRADE, A/K/A
  LEVYN HERBERTH ANDRADE CRUZ
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0329-22-4                      JUDGE JUNIUS P. FULTON, III
                                                           APRIL 11, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Stephen E. Sincavage, Judge

Tabatha N. Blake, Senior Trial Attorney (Office of the Public
Defender, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Levyn Andrade was convicted in the Loudoun County Circuit Court

of rape, abduction, unlawful wounding, and simple assault and battery, in violation of Code

§§ 18.2-61, 18.2-47, 18.2-51, and 18.2-57, respectively.[1]  Andrade asserts that the trial court abused

its discretion in allowing the Commonwealth to introduce prior bad acts evidence.  He also argues

---

* This opinion is not designated for publication.  *See* Code § 17.1-413.

[1] The conviction and sentencing orders state that Andrade was convicted of *felony* assault
and battery and lists the code section for strangulation, § 18.2-51.6; however, the jury convicted
Andrade of the lesser-included *misdemeanor* of assault and battery, which is a violation of Code
§ 18.2-57.  Therefore, we remand this case for the limited purpose of correcting the conviction
and sentencing orders.

that the evidence was insufficient to support his convictions for rape and abduction.[2] For the following reasons, we affirm the trial court's judgment.

## I. BACKGROUND[3]

C.A. married Andrade in February 2019, and their daughter was born in February 2020. C.A. also had two children from a prior relationship, A.A. and D.A. Andrade had three children from a prior marriage, L.A., F.A., and M.A. In October 2020, the couple lived together in an apartment in Ashburn, Virginia, with A.A., D.A., and their infant daughter. On October 3, 2020, C.A. and Andrade took all six children to a birthday party at the home of Andrade's brother, Ricardo. C.A. drank half of a Smirnoff seltzer around 11:00 p.m. and then two shots of tequila between 1:00 and 2:00 a.m. Andrade drank ten beers before 10:00 p.m. and then continued to drink beer throughout the night. He also consumed several shots of alcohol. Around 4:00 a.m., C.A. was outside talking to a friend, when Andrade, looking "very upset," indicated that he wanted to leave. C.A. continued her conversation with her friend, and Andrade opened the sliding glass door and told C.A. "when I say we go, we gotta go." C.A. asked Andrade to let her finish her conversation, but he replied, "no" and told her to get up. C.A. told him to stop speaking to her in that manner and stated that he needed to respect her. Still very upset, Andrade threw a baby blanket at C.A. C.A. began crying, and her friend told her to call if she needed anything.

C.A. gathered the children, and they left the party. C.A. drove, and Andrade sat in the passenger seat holding their infant daughter on his lap. The other five children sat in the back seat. C.A. first drove L.A. and F.A. to their mother's house and then drove home. It was a quiet ride, and

---

[2] Andrade does not challenge his convictions for unlawful wounding and assault and battery.

[3] "Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit court." *Porter v. Commonwealth*, 276 Va. 203, 215-16 (2008).

there was no interaction between C.A. and Andrade. At some point on the drive home, C.A. realized she did not know where her phone was. Once inside their apartment, C.A. put the older children to sleep and then entered the bedroom she shared with Andrade. Andrade closed and locked the door and instructed C.A. to put their infant daughter to sleep. C.A. laid on the bed and breast fed the baby until the baby fell asleep. When C.A. sat up on the bed, Andrade punched her in the face. C.A. fell back, and Andrade continued to strike her, hitting her very hard in her left eye. C.A. could not see anything as Andrade held her down by her neck. C.A. pushed Andrade off with her feet and dropped to the ground. Andrade repeatedly hit and punched C.A. about her head, face, shoulder, and her arms, all the while yelling that she was "never going to disrespect [him] again" and insisting that she was "going to learn [her] lesson." C.A. begged Andrade to stop. Their infant daughter awoke and began crying like she had "never cried before." Andrade allowed C.A. to put the baby back to sleep, but said she knew what she would have to do afterwards. C.A. knew that meant she would have to do "whatever he wanted sexually." C.A. responded, "I will do whatever you ask me to do."

At that point, A.A. having heard the altercation, knocked on the bedroom door and asked to say goodnight to C.A. She wanted to make sure C.A. was "okay." Andrade turned off the light so the child could not see C.A.'s face and then unlocked the door. A.A. approached C.A. in the dark and said goodnight to her mother. C.A. told A.A. that she was fine and then whispered for A.A. to call 911. After A.A. left the bedroom, Andrade shut and locked the door again, got on the bed, and told C.A. to get on top of him. C.A. did not feel that she could decline having intercourse with Andrade because he said he would continue to hit her if she did not do what he asked. At that moment, she feared for her life and was not willing to put her children at risk. C.A. was crying and in a tremendous amount of pain when she got on top of Andrade. Andrade grabbed C.A. and inserted his penis in her vagina, while saying "do it right, do it right. You'd better do it right."

Andrade told C.A., "if you don't do it right this is the last time you're going to do it." C.A. feared he was going to kill her. Andrade ordered C.A. to put his penis in her anus. When she objected, he lifted his chest in a threatening manner and simulated hitting her with his fist. C.A. pretended to engage in anal sex with Andrade and returned his penis to her vagina. Afterwards, Andrade allowed C.A. to go to the bathroom. When she returned from the bathroom, Andrade was asleep. C.A. "crawled to the ground, grabbed [Andrade's cell] phone, and dialed 911 and . . . went into the closet."

Over Andrade's objection, C.A. testified that she was afraid during this incident because Andrade physically abused her "multiple times during [their] marriage," resulting in past injuries. C.A. also testified that she was "terrified" of Andrade and feared he might try to kill her. The trial court limited C.A.'s testimony to prior physical, rather than sexual, abuse and instructed the jury that it could consider the testimony only "as evidence of the basis for [C.A.'s] decisions and actions in connection with the alleged crimes for which [Andrade] is on trial."

Loudoun County Emergency Communications Dispatcher Claudia Torres answered C.A.'s 911 call in the early morning hours of October 4, 2020. Torres testified that C.A. was "very scared, very shaken," and she was whispering. Torres had trouble understanding her because she was crying. The 911 call was also entered into evidence and played for the jury.

Loudoun County Sheriff's Deputy Brian Jarvis went to Andrade's apartment in response to the 911 call. Deputy Jarvis noticed that C.A.'s face was bruised and showed significant swelling. C.A. was crying and appeared to be terrified. After speaking with C.A., Deputy Jarvis entered the bedroom and awoke Andrade. Andrade smelled of alcohol, and his eyes were red. Deputy Jarvis observed "red marks and discolorations" to Andrade's hands but did not see any other injuries on Andrade's body.

Loudoun County Fire and Rescue paramedic Earl Hall went to the apartment in response to the 911 call and observed C.A. sitting on the edge of the bed holding her infant. Two additional children were "off to the side crying." C.A. appeared visibly upset, but she was conscious, alert, and oriented. Hall instantly noticed injuries to C.A.'s head and face. Her right eye was very bruised and swollen, and there was a contusion above her left eyebrow. Hall did not see any indication that C.A. was intoxicated. While transporting C.A. to the hospital, Hall noticed more marks appearing on C.A.'s neck and above her right eyebrow.

Loudoun County Sheriff's Deputy Joshua Schleffer assisted Deputy Jarvis in waking Andrade and finding clothes for him to wear. Deputy Schleffer noticed swelling on Andrade's knuckles and redness on his hands. He also saw a cut on Andrade's lip.

Sheriff's Deputy Samuel Staley photographed Andrade at the Loudoun County Adult Detention Center; he then went to the hospital to photograph C.A.'s injuries. The photographs were admitted into evidence at trial. Deputy Staley did not observe any additional injuries on Andrade other than the cut on his knuckle.

Sheriff's Deputy Phi Pham also went to the apartment in response to the 911 dispatch and spoke to Andrade. Andrade told Deputy Pham that he did not know what had occurred and stated that he went straight to sleep when he returned from Ricardo's party. Andrade denied that C.A.'s face was bruised at any time that evening but acknowledged that she had "redness" on the side of her face and forehead. Andrade said he consumed two to three drinks at the party, but then changed his answer and stated that he had only one drink. Deputy Pham noticed that Andrade's eyes were "bloodshot red" and there was an odor of alcohol emanating from his body. Andrade claimed that C.A. was the aggressor and that she abused him. Upon Deputy Pham's inquiry, Andrade stated that, although C.A. was mad at him, she still "absolutely" wanted to have sex with him. When Deputy Pham clarified whether C.A. had been aggressive with Andrade that night, Andrade said "not

tonight." Deputy Pham did not notice any wounds, marks, or other injuries on Andrade. Deputy Pham also did not notice any indication that C.A. was intoxicated.

At the Inova Fairfax Hospital emergency room, Sexual Assault Nurse Examiner Ashleigh Daniel performed a medical forensic examination on C.A. Daniel noted several injuries on C.A., including bruising and petechiae (broken blood vessels) in the area around C.A.'s left temple, hairline, the left side of her face, and her neck. Daniel also noticed bruising and petechiae around C.A.'s ears, which struck her as unusual because "[y]ou don't see a lot of injuries to the ear. . . . [I]t's a very uncommon place to get injured. . . . [A]ny sort of accidental injury on the ear is pretty rare." C.A. also had bruising and petechiae under her right eye and the right side of her face and bruising to her arm. C.A. had additional injuries to her eye, which had a subconjunctival hemorrhage, or "a collection of blood under the eyeball." Dr. Maria Van Winkle treated C.A. and diagnosed her with an orbital fracture, which is "a break in the bones around the . . . eye socket area." C.A. did not appear intoxicated to Dr. Van Winkle.

Loudoun County Sheriff's Detective Elissa Wilk met with C.A. days after the attack. C.A. was visibly shaking and crying. She appeared sad and scared. Detective Wilk took additional photographs of C.A.'s still visible injuries, which were admitted into evidence at trial. After interviewing and photographing C.A., Detective Wilk obtained additional warrants for Andrade. When Detective Wilk served the warrants on Andrade and informed him of the charges, Andrade said, "my wife started it. How could it be rape if she was on top?" A.A. testified that after the family returned home from Ricardo's party, she and her stepsister prepared to go to sleep. A.A. felt scared because she heard Andrade telling her mother "Shut the F up," so she went to her mother's bedroom to say goodnight. A.A. attempted to open the bedroom door, but it was locked, so she knocked and heard her mother tell her to go to sleep. A.A. did not want to go back to bed before speaking to her mother, so Andrade turned off the light before opening the bedroom door to allow

A.A. entry to the room. A.A. went to her mother on the bed and hugged her. While they were hugging, C.A. twice whispered for A.A. to call 911. A.A. left the bedroom and started to call 911, but then decided against it because she was not sure that she heard her mother correctly, and because she "was just so scared."

Andrade called two witnesses, one who acknowledged that he was a friend of Andrade, who had attended Ricardo's birthday party. Both testified that they observed C.A. drinking alcohol during the party, and both testified that C.A. was upset with Andrade toward the end of the party.

Andrade's son, L.A., testified that C.A. drank more than five shots of tequila at the party and that she became upset with Andrade as they left the party. In the car, L.A. observed C.A. hit Andrade in the arm three times with her fist. Because Andrade was sleeping, he did not respond. Andrade's other children, M.A. and F.A., also both testified that they observed C.A. drinking at the party and that she punched Andrade in the arm in the car.

Andrade testified that C.A. was physically abusive toward him during their marriage. He explained that when they arrived home from the party, C.A. began arguing with him. When he told C.A. she was crazy, C.A. became furious and jumped on top of him. Andrade claimed that C.A. "overdid [it] and pass[ed] [him] and slam[med] her face on the headboard." Andrade pushed C.A. "very hard" out of the bed. When C.A. tried to get on top of him again, he "grabbed her . . . between the head and the shoulders and . . . fully projected her out of the bed." C.A. "came back a third time," and he pushed her back, causing her to fall against the dresser. Andrade claimed that C.A. initiated a sexual encounter, but then she became frustrated and "just got off and went to the bathroom." Andrade testified that it was not uncommon for them to have sex after an argument. He denied harming C.A., restraining her liberty, or engaging in sexual intercourse with her against her will.

- 7 -

The jury convicted Andrade of rape, abduction, unlawful wounding, and assault and battery. Andrade noted this appeal.

## II. ANALYSIS

### A. Prior Bad Acts

Andrade first asserts that the trial court erred in allowing C.A. to testify that Andrade committed prior acts of physical violence toward her. We disagree.

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Jones v. Commonwealth*, 38 Va. App. 231, 236 (2002) (quoting *Blain v. Commonwealth*, 7 Va. App. 10, 16 (1988)). "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* (alteration in original) (quoting *Carter*, 293 Va. at 543-44). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

> As a general rule, evidence which shows or tends to show that the accused is guilty of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is not admissible to show the accused's commission of the particular crime charged.

*Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008). However, this general rule "must sometimes yield to society's interest in the truth-finding process, and numerous exceptions allow evidence of prior misconduct whenever the legitimate probative value outweighs the incidental prejudice to the accused." *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022) (quoting *Gonzales v. Commonwealth*, 45 Va. App. 375, 381 (2005) (*en banc*)).

> Specifically, other crimes evidence is admissible when it "shows the conduct or attitude of the accused toward his victim[;] establishes the relationship between the parties[;] or negates the possibility of accident or mistake[;]" or shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial.

*Kenner*, 299 Va. at 424 (alterations in original) (quoting *Ortiz*, 276 Va. at 714). "Once the Court has determined that the 'prior bad acts' evidence is relevant, and not mere 'propensity evidence,' the Court must still determine whether the risk of unfair prejudice outweighs the probative value of the evidence." *Conley*, 74 Va. App. at 671. Indeed, "[r]elevant evidence may be excluded if: . . . the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. Rule Evid. 2:403.

"Rule 2:403's requirement that only *unfair* prejudice may be considered as grounds for non-admission 'reflects the fact that all probative direct evidence generally has a prejudicial effect to the opposing party.'" *Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021) (quoting *Lee v. Spoden*, 290 Va. 235, 251 (2015)). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee*, 290 Va. at 251. In fact, "[a]ll evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Fields*, 73 Va. App. at 672-73 (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). "The responsibility for balancing the

probative value versus the prejudicial effect rests in the sound discretion of the trial court." *Kenner*, 299 Va. at 424.

Here, the Commonwealth was required to prove that Andrade engaged in sexual intercourse with C.A. against her will by force, threat, or intimidation and that he deprived her of her personal liberty by keeping her locked in the bedroom during the assault. *See* Code §§ 18.2-61 and 18.2-47. C.A. testified that she did not leave the bedroom during the assault because Andrade was "in between the door and herself" and she felt that he was "not going to let [her] get out of the room." C.A. "wouldn't have been able to walk out of the room." She also testified that she engaged in sexual intercourse with Andrade solely because "saying no was [not] an option" and because Andrade told her he was going to keep hitting her if she did not get on top of him and "do it right." C.A. feared for her life and was afraid for her children. Andrade disputed C.A.'s assertions and claimed that C.A. was not only free to leave the bedroom at any time, but that she initiated the sexual contact and consented to sexual intercourse. Thus, the evidence of Andrade's prior acts of physical violence toward C.A. was probative of C.A.'s state of mind and explained the reason she remained in the bedroom to engage in sexual intercourse with Andrade against her will. C.A.'s testimony proved that she was intimidated by his violence into doing "whatever [he] ask[ed] [her] to do." Indeed, Andrade's prior instances of violence established the nature of the relationship between Andrade and C.A. and explained the fear she felt in their bedroom during the early morning hours of October 4, 2020. Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. Rule Evid. 2:401.

Andrade's suggestion that C.A.'s testimony was more prejudicial than probative is not supported by the record. C.A. merely testified that Andrade physically abused her multiple times during the marriage resulting in past injuries. Given that C.A.'s testimony concerning past acts of

violence did not touch on the specific details of the prior bad acts but only their occurrence, was unlikely to be unfairly prejudicial or inflammatory to the jury, eliciting a disproportionate emotional response. Rather, the evidence helped explain why C.A. took Andrade at his word when he said he would keep hitting her if she did not do what she was told.

Because C.A.'s testimony regarding Andrade's prior acts of physical violence within the marriage was relevant to prove her lack of consent to the sexual intercourse and her belief that she was not free to leave the bedroom, and because its probative effect was not outweighed by any unfair prejudice to Andrade's defense, the trial court did not abuse its discretion in allowing it.

### B. Sufficiency of the Evidence

Andrade asserts that the evidence was insufficient to prove he committed the crimes of rape and abduction. He argues that the evidence failed to prove he deprived C.A. of her personal liberty and contends that the act of intercourse was consensual. Again, we disagree.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

## 1. Abduction

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of abduction.

Code § 18.2-47(A). "[T]he *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of her liberty." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022). "A defendant detains his victim by keeping the victim in a specific place 'through the use of force, intimidation, or deception.'" *Id.* at 731 (quoting *Commonwealth v. Herring*, 288 Va. 59, 74 (2014)). Proof of asportation is not required. "[M]ere detention is sufficient under Code § 18.2-47 to establish abduction." *Walker v. Commonwealth*, 272 Va. 511, 517 (2006). In enacting Code § 18.2-47, the General Assembly "focused on *control over* the victim as opposed to mere *movement of* the victim." *Walker v. Commonwealth*, 74 Va. App. 475, 490 (2022). "[A]n abduction occurs when a perpetrator, by means of 'force, intimidation or deception, and without legal justification or excuse,' exercises control over the victim 'with the intent to deprive such [victim] of his personal liberty.'" *Id.* (second alteration in original) (quoting Code § 18.2-47(A)).

"Intent is the purpose formed in a person's mind and may be, and frequently is, shown by the circumstances. It is a state of mind which may be proved by a person's conduct or by his statements." *Mason v. Commonwealth*, 49 Va. App. 39, 45 (2006) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "Whether the required intent exists is generally a question for the trier of fact." *Crawley v. Commonwealth*, 25 Va. App. 768, 773 (1997) (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)).

"Intimidation is defined as '[u]nlawful coercion; extortion; duress; putting in fear.'" *Bivins v. Commonwealth*, 19 Va. App. 750, 752 (1995) (alteration in original) (quoting *Black's Law*

*Dictionary* 831 (6th ed. 1990)). "Intimidation, . . . means putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will." *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985). "Intimidation may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Id.*

By shutting and locking the bedroom door shortly before he physically attacked C.A., Andrade demonstrated his intent to deprive C.A. of her personal liberty by detaining her in the room. Not only did Andrade lock the door, impeding C.A.'s escape while he beat her, but he also held C.A. down by her neck until she was able to push him off with her feet. Andrade then continued to punch C.A. on her head, face, shoulder, and arms, all the while yelling, "you're never going to disrespect me again, this is the last time you're going to disrespect me. You're going to learn your lesson." Notably, at the time of the attack, C.A. was only five feet one inch tall and weighed 103 pounds.[4] When A.A. came to check on her mother, it was Andrade who opened the door and allowed A.A. entry into the room, and it was Andrade who shut and locked the door again when A.A. left. C.A. testified that she did not follow A.A. out of the room because Andrade was between her and the door, thus preventing her from leaving, and because she was afraid for herself and the risk of harm to her children. C.A.'s whispered plea for A.A. to call 911 highlighted C.A.'s fear that she could not leave the bedroom without the assistance of outside help. On these facts, it was reasonable for the jury to conclude that Andrade was angry with C.A. for her perceived disrespect of him at the party, so he intentionally locked her in the bedroom and prevented her from leaving until she learned her "lesson." In other words, he abducted her.

---

[4] The jury had the opportunity to observe Andrade's stature and size, which the arrest warrants describe as 6 feet tall and 180 pounds.

Because the evidence sufficiently proved that Andrade by force, intimidation, or deception, and without legal justification or excuse, detained C.A. in the bedroom with the intent to deprive her of her personal liberty, the trial court did not err in denying the motion to strike the abduction charge.

## 2. Rape

"If any person has sexual intercourse with a complaining witness, whether or not his or her spouse . . . and such act is accomplished . . . against the complaining witness's will, by force, threat or intimidation . . . he or she shall be guilty of rape." Code § 18.2-61(A). "The issue of whether the crime was committed by 'force, threat or intimidation' is a question of fact." *Bondi v. Commonwealth*, 70 Va. App. 79, 88 (2019). "A factfinder may consider 'the victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and victim, and the vulnerable position of the victim' in evaluating whether an act was accomplished by intimidation." *Id.* at 90 (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)). "Intimidation may occur without threats." *Sutton*, 228 Va. at 663. In such cases, the fear of bodily harm "must derive from some conduct or statement of the accused." *Sabol v. Commonwealth*, 37 Va. App. 9, 18 (2001). On the other hand, a threat is an "expression of an intention to do bodily harm." *Id.* at 17 (quoting *Morse v. Commonwealth*, 17 Va. App. 627, 634 (1994)). That is, a threat is "an overt expression, by words or conduct, of a present intention to commit an immediate act of violence or force against the victim." *Id.* at 18 (quoting *Bivins v. Commonwealth*, 19 Va. App. 750, 752 (1995)).

"In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).

- 14 -

Moreover, "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)). "Because sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Garland v. Commonwealth*, 8 Va. App. 189, 191 (1989). We defer to the jury's findings of fact "unless plainly wrong or without evidence to support them." *Branch v. Commonwealth*, 60 Va. App. 540, 548 (2012) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*)). Additionally, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

In this case, just before the sexual intercourse, Andrade beat C.A. so severely that she was ultimately hospitalized with broken bones in her orbital socket. During that beating, Andrade repeatedly told her that she was never going to disrespect him again, and he swore that she was going to "learn [her] lesson." After their infant daughter awoke, crying "like never before," Andrade allowed C.A. to soothe the child back to sleep, but not before telling her "you know what you have to do afterwards." C.A., crying and in pain from Andrade's many blows to her face, knew that she would have to do "whatever he wanted sexually from [her]." Thereafter, Andrade ordered C.A. to get on top of him and cautioned "you know what you have to do. And if you don't do it, I'll keep hitting you." At that time, C.A. "fear[ed] for [her] life." Andrade also repeatedly told C.A. that "if you don't do it right[,] this is the *last* time you're going to do it." (Emphasis added). C.A. believed Andrade was "going to try to kill [her]." C.A. testified repeatedly that she did not want to have sex with Andrade and only did so out of fear that he would continue to hurt her.

C.A.'s testimony established that Andrade both threatened and intimidated her into complying with his demand for sex. C.A. repeatedly stated that she feared any refusal to comply with Andrade's demands for sexual intercourse would subject her to further bodily injury. That fear was reasonable based on the multiple acts of violence Andrade committed during the marriage and the severe beating C.A. had just endured. "Submission through fear to sexual intercourse is not consent." *Sutton*, 228 Va. at 663. In rendering its verdicts, the jury clearly rejected, as it was entitled, Andrade's version of events and concluded that the act of sexual intercourse was not consensual. We do not disturb the jury's credibility findings on appeal. It is well settled that "[w]here credibility issues are resolved by the jury in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010).

C.A.'s testimony, believed by the jury and corroborated by other evidence in the record, including the many photographs of her injuries and the respective testimony of the other witnesses, provided sufficient evidence for the trial court to conclude that Andrade forced C.A. into engaging in sexual intercourse against her will by threatening her with further violence and intimidating her into submission. Thus, the trial court did not err in refusing to strike the indictment.

## III. CONCLUSION

The trial court did not abuse its discretion in allowing C.A. to testify that Andrade committed prior acts of physical violence toward her during their marriage, inasmuch as that evidence was probative of the element of intimidation and was not unfairly prejudicial. Additionally, the trial court did not err in finding the evidence sufficiently established that Andrade committed rape and abduction beyond a reasonable doubt. Therefore, we affirm the convictions.

We remand this case to the circuit court solely to correct the typographical errors in the conviction and sentencing orders.

*Affirmed and remanded.*